1
2
3
4
5                          IN THE UNITED STATES DISTRICT COURT
6                        FOR THE NORTHERN DISTRICT OF CALIFORNIA
7
8    RES-CARE INC.,                              No. C-09-03856 EDL
9              Plaintiff,                        **OPINION AND ORDER DENYING**
                                                 **DEFENDANT ROTO-ROOTER'S**
10       v.                                      **MOTION FOR SUMMARY JUDGMENT**
                                                 **AND GRANTING IN PART AND**
11   ROTO-ROOTER SERVICES COMPANY,               **DENYING IN PART DEFENDANT**
                                                 **LEONARD VALVE'S MOTION FOR**
12             Defendant.                        **SUMMARY JUDGMENT**
     _____/
13
14       Plaintiff Res-Care, Inc. brought this action for indemnity against Defendants Roto-Rooter,

15   Leonard Valve and Bradford White arising from Plaintiff's $8.5 million settlement of a lawsuit

16   brought by the Conservator of a severely developmentally disabled adult, Theresa Rodriguez, who

17   was badly scalded by hot water during a shower at her residential care facility.  Defendants Roto-

18   Rooter and Leonard Valve have moved for summary judgment.

19       The Court held a hearing on Defendants' Motions on September 16, 2010.  The Court issued

20   a brief order on October 1, 2010 denying both motions.  This opinion sets forth the Court's

21   reasoning in detail.

22   **Legal Standard**

23       Summary judgment shall be granted if "the pleadings, discovery and  disclosure materials on

24   file, and any affidavits show that there is no genuine issue as to any material fact and that the

25   movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

26   which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

27   (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

28   to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

     favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

**United States District Court**
For the Northern District of California

from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).  The evidence presented by the parties must be admissible.  Fed. R. Civ. Proc. 56(e).

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case.  Id.

If the moving party meets its initial burden, the opposing party "may not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  "Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."  Soremekun v. Thrifty Payless, Inc. 509 F.3d 978, 984 (9th Cir. 2007); see also Nelson v. Pima Community College, 83 F.3d 1075, 1081-82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment").  If the nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to judgment as a matter of law."  Celotex, 477 U.S. at 323.

**Roto-Rooter's Motion for Summary Judgment**

Roto-Rooter moves for summary judgment on the grounds that: (1) Plaintiff cannot provide evidence that Roto-Rooter's conduct was intentional so as to indemnify Plaintiff or its employee for their relative intentional conduct; (2) Plaintiff will be unable to demonstrate that any portion of the settlement of the underlying action represents comparative negligence of Roto-Rooter because Plaintiff failed to allocate the settlement according to the claims in the underlying case; and (3) the intentional misconduct of Plaintiff and the criminal misconduct of its employee constitute

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1    superceding causes that cut off any potential liability on the part of Roto-Rooter.

2    **A.    Facts**

3            Theresa Rodriguez is a severely developmentally disabled woman who resided at McGarvey

4    House, a residential care facility for severely developmentally disabled individuals located in San

5    Mateo County owned by Plaintiff, from 2002 until the scalding incident on May 5, 2004.

6    Declaration of Angela Ompoc (Ompoc Decl.) Ex. A.  She was dependent on staff for activities of

7    daily living, including showering.  Ompoc Decl. Ex. B.[1]

8            Plaintiff has a commercial account with Roto-Rooter.  Ferguson Decl. Ex. K at 77-78.  On

9    April 28, 2004, Roto-Rooter was called to the McGarvey House to replace a leaking water heater.

10   Ompoc Decl. Ex. C at 78-79; Declaration of Lori Ferguson (Ferguson Decl.) Ex. E.  Keith Campbell

11   was the plumbing service technician sent to McGarvey House that day.  Ompoc Decl. Ex. D;

12   Ferguson Decl. Ex. E.  He had been an employee of Roto-Rooter for nine and one half years.  Id.

13           Roto-Rooter states on its website that it has factory trained and expert plumbers, with

14   specific expertise in serving the plumbing needs of hospitals and nursing homes.  Ferguson Decl.

15   Ex. C.  Roto-Rooter exercises control over its company-owned locations, including the Burlingame

16   location at issue in this case.  Ferguson Decl. Ex. D at 13.

17           Campbell removed a 50-gallon water heater and replaced it with a 50-gallon Bradford White

18   water heater.  Ompoc Decl. Ex. D.  He was not advised on that date that there were any problems

19   with temperature fluctuation.  Ompoc Decl. Ex. E.  He did not speak with anyone at the McGarvey

20   House to ascertain any information about the particular needs of the McGarvey House residents with

21   respect to hot water.  Ferguson Decl. Ex. G at 69.  He did not know when he went to the McGarvey

22   House that it was a residential care facility.  Ferguson Decl. Ex. G at 105.

23           After installing the water heater, Campbell set the temperature to between "high" and

24   "warm" where he usually sets it, but which is higher than the manufacturer's recommended setting.

25   Ompoc Decl. Ex. F; Ferguson Decl. Ex. H at RR000033.  He estimated that the temperature at that

26   setting would probably be 118 or 120 degrees.  Ferguson Decl. Ex. G at 135.  He testified that in

27

28          [1]      Roto-Rooter has filed objections to Plaintiffs' evidence.  The Court's rulings on those
                     objections are set out in a separate order.

**United States District Court**
For the Northern District of California

general, his determination of where to set the temperature of the water heater is not influenced by who would be using the hot water.  Ferguson Decl. Ex. G at 77.  Campbell did not test the water temperature before leaving the McGarvey House; it is not his practice to do so because it takes about forty-five minutes for the water to heat up and because there is no training to test the temperature before leaving.  Ferguson Decl. Ex. G at 73-74.  According to Plaintiff's expert, the failure to test the water temperature was contradicted the manufacturer's instructions and was a breach of his duty as a plumber.  Declaration of Ronald George (George Decl.) Ex. B at 12-13.  Further, according to the expert, Campbell's reliance on the water heater's thermostat to control the outlet temperature was a violation of the Uniform Plumbing Code because the thermostat cannot accurately control the hot water in the water heater.  Id. at 14.  The Bradford White manual states that water above 125 degrees can cause severe burns instantly.  Ferguson Decl. Ex. H at RR000029.

Campbell did not make any adjustments to the mixing valve manufactured by Leonard Valve that had been attached to the water heater at the McGarvey House, nor did he know what it was when he saw it attached to the water heater.  Ompoc Decl. Ex. H; Ferguson Decl. Ex. I; Ex. G at 74-75, 113.  Plaintiff's expert testified that an adequately trained plumber would have known what a mixing valve was and would have checked it when changing the water heater.  Ferguson Decl. Ex. K at 70; George Decl. Ex. B.  The mixing valve was connected to the water heater by a short branch pipe and was visible.  Ferguson Decl. Ex. G, I, K.  The purpose of a mixing valve is to reduce the temperature from a boiler or heater down to a lower level.  Ompoc Decl. Ex. J; Ferguson Decl. Ex. K.  The valve operates as a safety device, so that if the water comes out of the water heater at an unsafe temperature, the mixing valve will bring the temperature down to a safe level before delivering the water to the household fixtures.  Ferguson Decl. Ex. K.  The mixing valve label stated that it was not to be used for "direct showering or bathing applications."  Ompoc Decl. Ex. I.

Campbell did not have any factory training with respect to the Bradford White water heater or anything else.  Ferguson Decl. Ex. G at 93.  Roto-Rooter has no factory training program.  Ferguson Decl. Ex. D at 37-38.  Roto-Rooter also has no specific training for the hospital and nursing home industries.  Id. at 103-06.  Campbell did not receive any training from Roto-Rooter about mixing valves.  Ferguson Decl. Ex. G at 74-75, 113.  Campbell did not read the Bradford

1   White instruction manual that came with the water heater that he installed at the McGarvey House.

2   Ferguson Decl. Ex. G at 95-97.  Campbell did not know anything about applicable state and local

3   plumbing codes, including the code sections specifying that a permit must be obtained before

4   installation of a water heater.  Ferguson Decl. Ex. G at 104-05, 110, 122-23; Request for Judicial

5   Notice Ex. 2 (Uniform Plumbing Code).

6   The McGarvey House maintains a temperature log in which staff daily tracks the temperature

7   of the water coming out of the shower.  Ompoc Decl. Ex. G (April), N (May).  Staff checks the

8   temperature by letting the water run hot, putting the water in a container and using a thermometer to

9   determine the temperature.  Ompoc Decl. Ex. P at 39; Ex. W at 17.  Temperatures for showers

10   should be between 100 and 110 degrees.  Id.  The temperature log from McGarvey House shows that

11   the water temperatures were in the normal range of about 110 degrees for the two days following the

12   water heater installation on April 28, 2004.  Ompoc Decl. Ex. G.  In the five days before the

13   scalding incident on May 5, 2004, the water temperature readings were much higher than 110

14   degrees, including up to 135 degrees.  Ompoc Decl. Ex. N.  The McGarvey House manager,

15   Frederick Porche, admitted that he adjusted the knob on the water heater in an attempt to change the

16   temperature.  Ompoc Decl. Ex. U at 62.  Staff workers at the McGarvey House notified the

17   administrator of the temperature fluctuations for at least five days before the incident.  Ompoc Decl.

18   Ex. B at RC-INDEMNITY000012.  According to the investigation report regarding the scalding

19   incident by the Department of Health Services, at 10:45 a.m. on May 5, 2004 (the date of the

20   incident), Kelli Stanton-Clarke, Plaintiff's administrator, was instructed to cease using hot water for

21   showering or bathing clients until further notice.  Ompoc Decl. Ex. B at RC-INDEMNITY 000008.

22   However, Plaintiffs' Executive Director, Faye Richins, testified that she did not know if the

23   Department of Health Services had ordered showers to be ceased before the incident.  Ferguson

24   Decl. Ex. R at 97.  Stanton-Clarke testified that she could not recall if anyone ordered showers to

25   cease before the incident.  Id. Ex. Q at 154-55.

26   Richins stated in a declaration submitted in the underlying state court matter that Porche told

27   her that he contacted Roto-Rooter several times between April 28, 2004, the date of the water heater

28   installation, and May 4, 2004, the day before the incident, to complain about the fluctuations in

United States District Court
For the Northern District of California

water temperatures at McGarvey House.  Ferguson Decl. Ex. M at ¶ 4.  Bill Foley of Roto-Rooter, however, stated that there were no calls from the McGarvey House to Roto-Rooter between April 28 and May 5, and that the next contact was on May 6.  Ompoc Decl. Ex. T at 92-93.  The investigation report does not mention any attempts by McGarvey House employees to contact Roto-Rooter.  Ompoc Decl. Ex. B.  Roto-Rooter did not send a technician to the McGarvey house between April 28 and May 5, 2004.  Ferguson Decl. Ex. E.

Oretha Ocansey, an employee at McGarvey House, gave Ms. Rodriguez a shower at approximately 7:00 p.m. on May 5, 2004.  Ompoc Decl. Ex. V at 188.  After removing Ms. Rodriguez from the shower, Ocansey dressed Ms. Rodriguez and placed her in bed.  Ompoc Decl. Ex. B.  As a result of the shower, Ms. Rodriguez sustained second degree burns to her abdomen and lap areas, over 20% of her body.  Ompoc Decl. Ex. B; Declaration of Sridhar Natarajan (Natarajan Decl.) ¶ 6 (burns not caused by hot water immersion, but by intermittent elevation in water temperature to approximately 130 degrees during the showering process).  Ocansey did not seek help for Ms. Rodriguez, until two hours later when she was changing Ms. Rodriguez's adult disposable brief, Ocansey asked Alfredo Mercado, another staff member, to observe Ms. Rodriguez's blisters and peeling skin.  Ompoc Decl. Ex. B.  The investigation report states that Ocansey denied giving Ms. Rodriguez a shower that night.  Ompoc Decl. Ex. B.  After Ms. Rodriguez's shower, Mercado had showered two other clients without incident.  Ompoc Decl. Ex. V at 304.

Another hour passed before staff called 911 for Ms. Rodriguez.  Ompoc Decl. Ex. B.  Another staff member who was present on May 5, 2004, Norma Molina, testified that the house manager, Porche, advised against calling 911 because it "would be a problem for the company."  Ompoc Decl. Ex. X.  Porche testified that on  the night of the incident, he was at home sleeping when Mercado called him to say that Ms. Rodriguez had a blister, but Mercado did not say it was a burn.  Ferguson Decl. Ex. S at 101.  Porche told Mercado to put ointment on it.  Id.  Then Ocansey called him and said only: "I didn't do anything, I didn't do anything."  Id. at 103.  Then Mercado called back to say that the skin was peeling back and that 911 had already been called because another staff member called immediately when she saw Ms. Rodriguez's condition.  Id. at 105.

**United States District Court**
For the Northern District of California

Plaintiff's expert states that while delay in treatment can cause additional progression in burn severity in some instances, the evidence does not support a finding in this case that the delay in treatment significantly contributed to their severity or caused complications that worsened Ms. Rodriguez's injuries.  Natarajan Decl. ¶ 6.  Roto-Rooter's expert, however, testified that the delay in treatment caused the burns to progress from second to third degree.  Ompoc Decl. Ex. Y.  As a result of her injuries, Ms. Rodriguez underwent painful treatment, and became dependent on a ventilator and restricted to an acute care hospital facility.  Ompoc Decl. Ex. Z.

Ocansey eventually pled nolo contendere to violation of California Penal Code section 368, elder abuse, for her role in causing Ms. Rodriguez's injuries.  Ompoc Decl. Ex. AA at 4.

Following the incident, the mixing valve was found to be corroded.  Ompoc Decl. Ex. K at 70.  Roto-Rooter's expert testified that the condition of the  mixing valve indicated that it was likely inoperable for over two months prior to the incident.  Ompoc Decl. Ex. L.  Roto-Rooter technicians made two visits to the McGarvey House after May 5, 2004 before discovering on a third visit (by another plumbing technician) that the mixing valve was corroded.  Ferguson Decl. Ex. E.

As a result of the injuries to Ms. Rodriguez, the Conservatorship of Ms. Rodriguez filed a civil suit against Plaintiff and its employees alleging violations of the state elder abuse act and California Business and Professions Code section 17200, as well as negligence and breach of fiduciary duty.  Ompoc Decl. Ex. BB.  Roto-Rooter was not named as a defendant.  Id.  Plaintiff filed a cross-complaint against Roto-Rooter, Leonard Valve and Bradford White in the state court action, alleging negligence and products liability.  Ompoc Decl. Ex. CC.  Three days into the trial, Res-Care dismissed without prejudice its cross-complaint against Roto-Rooter.  Ompoc Decl. ¶ 41.

On July 24, 2008, Plaintiff entered into a settlement agreement with the Conservatorship in the amount of $8.5 million.  Ompoc Decl. Ex. DD.  The settlement did not allocate the total amount between the claims in  the complaint, and the settlement resolved the claims against Ocansey as well.  Id.  Plaintiff's expert has opined that the settlement was reasonable, but there has been no court determination of good faith settlement.  Kornblum Decl. Ex. B at 4-11.  On August 21, 2009, Plaintiff filed this action for indemnity.

//

//

**B.      Discussion**

**1.      Standing to seek indemnity**

Roto-Rooter argues that Plaintiff's intentional conduct, including that of Ocansey, precludes Plaintiff from receiving indemnity and contribution.  "There shall be no right of contribution in favor of any tortfeasor who has intentionally injured the injured person."  Cal. Code of Civil P. 875(d); Bartneck v. Dunkin, 1 Cal.App.3d 58, 61 (1969) ("Subdivision (d) of section 875 clearly denies the right of contribution to 'any tortfeasor who has intentionally injured the injured person.'").  An intentional tortfeaser is entitled to seek indemnity from a concurrent intentional tortfeasor (Baird v. Jones, 21 Cal.App.4th 684 (1993)), but an intentional tortfeasor is barred from seeking partial indemnity from a negligent tortfeasor (Allen v. Sundean, 137 Cal.App.3d 216 (1982); Thomas v. Duggins Constr. Co., 139 Cal.App.4th 1105, 1112-13 (2006) ("The same policy considerations of deterrence and punishment that bar a reduction of an intentional tortfeasor's liability to reflect the plaintiff's contributory negligence also support the conclusion that an intentional tortfeasor's liability to the plaintiff is not subject to apportionment (i.e., reduction) where the negligence of one or more third party tortfeasors contributed to the injuries.")); Weidenfeller v. Star and Garter, 1 Cal.App.4th 1, (1991) (stating that a party that commits an intentional tort cannot escape responsibility for damages based on the negligence of the joint tortfeasor, but "Unlike Godfrey and Allen, this is not a case where the intentional actor is attempting to shift its financial burden to a negligent party.  We have the converse situation, where the injured party is attempting to transfer the intentional actor's responsibility to the negligent tortfeasor.").

Here, unlike in Weidenfeller, Allen, and Baird, there was no trial in the underlying state court action resulting in a finding of fact of intentional acts.  Further, Plaintiff made no admission of liability when it settled the underlying case.  See Ompoc Decl. Ex. DD at 4.  In addition, Plaintiff notes that Res-Care, Inc. was granted summary judgment on the punitive damages claim in the underlying case, which is somewhat inconsistent with a finding of intentional conduct by Plaintiff or its employee.  See Request for Judicial Notice Ex. 3.  Plaintiff also notes that an elder abuse act violation may be based on recklessness and is not limited to intentional misconduct.  See

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Conservatorship of Gregory, 80 Cal.App.4th 514, 521 (2000).  Further, Ocansey's plea of nolo contendere was to a violation of California Penal Code section 368(b)(1), which does not require a showing of intent.  See People v. Holvey, 205 Cal.App.3d 51, 60 (1988); see also Request for Judicial Notice Ex. 1 (Petition and Order of Expungement for Ocansey).  Plaintiff also notes that Plaintiff was not cited by the Department of Health Services for violation of the  state Elder Abuse and Dependent Adult Civil Protection Act, but instead for violation of Welfare and Institutions Code section 4502 (b), (d), (h) and (i).[2]  Finally, even the evidence cited by Roto-Rooter to support the argument that Plaintiff engaged in intentional conduct is disputed.  For example, Roto-Rooter stated in its motion that Porche advised against calling 911, impliedly on the evening in question.  But the evidence is that Molina, a staff person, stated that generally Porche advised against calling 911, not that he did so on the evening of the incident.  Thus, the rule barring an intentional tortfeasor from

[2]      California Welfare and Institutions Code section 4502 states in pertinent part:

Persons with developmental disabilities have the same legal rights and responsibilities guaranteed all other individuals by the United States Constitution and laws and the Constitution and laws of the State of California. No otherwise qualified person by reason of having a developmental disability shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity, which receives public funds.

It is the intent of the Legislature that persons with developmental disabilities shall have rights including, but not limited to, the following:

* * *

(b) A right to dignity, privacy, and humane care. To the maximum extent possible, treatment, services, and supports shall be provided in natural community settings.

* * *

(d) A right to prompt medical care and treatment.

* * *

(h) A right to be free from harm, including unnecessary physical restraint, or isolation, excessive medication, abuse, or neglect.

(i) A right to be free from hazardous procedures.

* * *

**United States District Court**
For the Northern District of California

1  recovering partial indemnity in some cases does not apply.  See, e.g., Weidenfeller, 1 Cal.App.4th at

2  8-9 (determination of intentional misconduct following full trial); Baird, 21 Cal.App.4th at 692-93

3  (same); Allen, 137 Cal.App.3d at 224-25 (finding that a developer engaged in willful misconduct

4  after full trial).

5         Roto-Rooter argues that the allegations in the complaint in the underlying case are

6  instructive in framing Plaintiff's right to indemnity, even absent a judicial finding of intent.

7  Specifically, Roto-Rooter points to the allegations in the state court complaint against Res-Care that

8  Res-Care "knowingly set the water temperature at an unsafe level," and "knowingly" placed Ms.

9  Rodriguez in a hot shower "knowing" that temperatures were being recorded as excessive.  Ompoc

10  Decl. Ex. BB at 7, 10.  Roto-Rooter, however, cites no authority that the bare allegations in a

11  complaint are sufficient for the Court to determine as a matter of law that a party engaged in

12  intentional conduct.

13         Roto-Rooter argues that because Plaintiff settled the state court action only on behalf of itself

14  and its employees, and there is no evidence that the parties settled claims based on the fault of any

15  other party, including Roto-Rooter, Plaintiff's indemnity claim fails.  Specifically, Roto-Rooter

16  points to the  testimony of Plaintiff's Rule 30(b)(6) witness:

17         Q: Did the 8.5 million dollars in settlement contain any funds that reflected conduct
           of parties other than Res-Care and its employees?
18         A: Can you repeat that, please. (Read back).
           A: No.
19

20  See Ferguson Decl. Ex. U at 34.  Roto-Rooter cites Angelus Assoc. Corp. v. Neonex Leisure Prods.,

21  167 Cal.App.3d 532, 535 (1985) in support of its argument.  Angelus, however, is inapposite.  In

22  Angelus, the question before the court was whether a nonsettling defendant retailer in a products

23  liability action may pursue a cross-complaint for total equitable indemnity against the defendant

24  manufacturer despite its good faith settlement with the plaintiff.  The Court of Appeals answered

25  yes.  In that case, the retailer and the manufacturer were both defendants in the case brought by the

26  plaintiff for injuries arising out of a mobile home explosion.  The language from Angelus cited by

27  Roto-Rooter here was in the context of the court giving a historical perspective on the state of the

28  law of implied equitable indemnity.  Angelus, 167 Cal. App. 3d at 535.  Further, the testimony of

Plaintiff's Rule 30(b)(6) witness regarding the composition of the state court settlement is

United States District Court
For the Northern District of California

1  ambiguous.  A jury could interpret that testimony as suggested by Plaintiff, that is, that Res-Care

2  simply paid the settlement amount, not that the settlement was only for the conduct of Res-Care,

3  RCCA and Ocansey.

4      Accordingly, viewing the evidence in the light most favorable to Plaintiff, Roto-Rooter's

5  motion for summary judgment based on Plaintiff's lack of standing is denied.

6      **2.    Failure to show that the settlement was in good faith or to allocate settlement
            amount**

7      Roto-Rooter argues that Plaintiff is not entitled to indemnity or contribution because Plaintiff

8  failed to seek a good faith determination of the settlement and failed to allocate the settlement

9  according to the claims in the underlying action.

10          **a.    Good faith settlement**

11     California Code of Civil Procedure section 877.6, which governs the determination of good

12 faith settlements, does not require that a party seek a good faith determination.  However, if a good

13 faith settlement determination is sought, the parties must allocate the settlement between issues

14 and/or parties.  See Erreca's v. Superior Court, 19 Cal.App.4th 1475, 1488 (1994); Regan Roofing

15 Co. v. Superior Court,. 21 Cal.App.4th 1685, 1701 (1994).  Roto-Rooter has provided no caselaw to

16 support its argument that because Plaintiff did not seek a good faith settlement determination,

17 Plaintiff cannot seek indemnity from Roto-Rooter.  There was no requirement that Plaintiff seek a

18 determination of the good faith of the settlement under California Code of Civil Procedure section

19 877.6.  Thus, the failure to do so does not support summary judgment in favor of Roto-Rooter.

20          **b.    Allocation of settlement**

21     Roto-Rooter argues that Plaintiff is not entitled to indemnification because it failed to

22 allocate the settlement not only as to the negligence claims, but also as to economic and

23 noneconomic damages.  Where the "settling parties have failed to allocate, the trial court must

24 allocate in the manner which is most advantageous to the nonsettling party."  Dillingham

25 Construction v. Nadel Partnership, 64 Cal.App.4th 264, 287 (1998); see also Knox v. County of Los

26 Angeles, 109 Cal.App.3d 825, 835 (1980) (holding that the plaintiff has the burden of proving an

27 agreed allocation in a settlement as between the claims in which joint tortfeasor status was alleged,

28 so the court could determine the appropriate setoff amount to be applied against a money judgment

United States District Court
For the Northern District of California

entered in the plaintiff's favor after trial against a non-settling defendant, and remanding for further

proceedings to determine the setoff amount). The testimony of an attorney for the party seeking

indemnification is not reliable evidence of the allocation. See id. at 285; id. at 277 (testimony from

attorney and expert not sufficient to show allocation because the numbers "sprang from the head of

counsel for Dillingham and were not the subject of negotiation or allocation by the settling parties.

Nor were the allocations the subject of the hearing undertaken to determine the good faith of the

settlement, which resolved the issue of only whether the settlement as a whole was adequate."). The

Dillingham court also stated:

> However, since no allocation was contained in the settlement agreement or presented
> to the trial court at the time of the good faith hearing, Dillingham was foreclosed
> from basing its indemnification claim against Nadel on the terms of the settlement.
> Where a settling defendant is entitled to only partial indemnity, failure to allocate
> between claims in the settlement agreement means that damages must be proven
> without the presumptive evidence of the nonsettling defendant's liability afforded by
> a settlement agreement in which proceeds have been allocated. In that situation, the
> settlement amount works only to place an upper limit on the indemnity claim, and an
> undisclosed and possibly nonexistent allocation cannot be used to establish actual
> damages.

Dillingham, 64 Cal.App.4th at 284; id. at 285 ("As we see it, a reasonable settlement amount can be

used to establish damages in equitable indemnity actions, where (1) the parties to the settlement

agreement have entered into a negotiated agreement specifically allocating settlement proceeds

between claims; and (2) in a proceeding in which the nonsettling parties are allowed to be heard, the

trial court finds that the allocation was made in good faith. If no such pretrial allocation and

determination has been made, there may be other methods to establish damages. However, an

attorney for the party seeking indemnification cannot be permitted to testify, after the fact, as to how

he believes settlement proceeds would have been allocated had the parties negotiated and resolved

the issue.").

"Where multiple tortfeasors are responsible for an indivisible injury suffered by the plaintiff,

each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held

individually liable to the injured plaintiff for the entirety of such damages." Expressions at Rancho

Niguel v. Ahmanson Development Inc., 86 Cal.App.4th 1135, 1139 (2001). An individual

tortfeasor's joint and several liability for noneconomic damages is limited to its proportion of fault.

1    Marina Emergency Medical v. Superior Court, 84 Cal.App.4th 435, 439 (2000); Cal. Civil Code §

2    1431.2 (requiring that liability for noneconomic damages must be several, not joint).

3         The failure to allocate is not fatal to a determination of indemnity, but instead when there is

4    no allocation, the trier of fact must determine the allocation before determining indemnity.  See

5    Dillingham, 64 Cal.App.4th at 276; Union Pacific Corp. v. Wengart, 79 Cal.App.4th 1444, 1448

6    (2000) (stating that the jury in that case should have been instructed to determine the amount of

7    settlement attributable to economic losses and the defendant should have only been charged with his

8    proportionate share of that amount).  In Union Pacific, the court stated that:

9         When liability is "several only and ... not joint," we see no justification for permitting
          one defendant to satisfy the liability of another and then seek to recover for a
10        payment it was never obliged to make.

11   Union Pacific, 79 Cal.App.4th at 1449.

12        It is undisputed that there was no formal allocation of the state court settlement in this case,

13   and that the settlement was for a lump sum.  However, Plaintiff argues that the settlement was

14   allocated in part because the agreement itself states that the $8.5 million settlement amount was for

15   the care of Ms. Rodriguez and provides that none of the proceeds for her care will revert to

16   Defendants should any remain after her death.  Ompoc Decl. Ex. DD at 1-2.  Further, Plaintiff's

17   representative testified that the vast majority of the settlement was paid in consideration of past and

18   future medical expenses.  See Ferguson Decl. Ex. U at 33-34.  Plaintiff points out that even if there

19   had been formal allocation in the settlement, it would not have been binding in this case.

20   Dillingham, 64 Cal.App.4th at 384-85 ("'A presumption that the parties have reasonably allocated a

21   settlement amount between issues in the action should be reserved for a settlement by parties with

22   truly adverse interests in the allocation. [Citation.] Where the parties have purported to settle an

23   imaginary dispute over allocation, that allocation should be given no special treatment in an

24   indemnity action.' ( Ibid.).") (quoting Peter Culley & Associates v. Superior Court, 10 Cal.App.4th

25   1484, 1498 (1992)).

26        Accordingly, drawing all inferences in favor of Plaintiff, and because the question of the

27   allocation of the settlement is disputed, summary judgment is denied on this basis.

28        **3.**       **Superceding causes**

13

Roto-Rooter argues that the intentional conduct of Plaintiff as well as the criminal conduct of Ocansey were so extraordinary as to cut off any negligence by Roto-Rooter.  "A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about."  Restatement of Torts, § 440.  "Where, subsequent to the defendant's negligent act, an independent intervening force actively operates to produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury might have been reasonably foreseen, the defendant is liable, but that if the independent intervening act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it is a superseding cause, and the defendant is not liable."  6 Witkin, Summary of California Law, § 1197 (10th ed. 2005).

"Whether the act of the third person is a superseding cause depends in part on whether it (and plaintiff's injury) was reasonably foreseeable."  Powell v. Standard Brands Paint Co., 166 Cal.App.3d 357, 364 (1985); see also Torres v. Xomox Corp., 49 Cal.App.4th 1, 19 (1996) ("It must appear that the intervening act has produced 'harm of a kind and degree so far beyond the risk the original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' . . . As Xomox notes, there are cases in which the modification of a product has been determined to be so substantial and unforeseeable as to constitute a superseding cause of an injury as a matter of law. . . However, foreseeability is a question for the jury unless undisputed facts leave no room for a reasonable difference of opinion.  . . . Thus, the issue of superseding cause is generally one of fact.") (internal citations omitted); Pappert v. San Diego Gas & Electric Co., 137 Cal.App.3d 205, 210 (1982) ("Several cases express this proposition in the strict affirmative, stating '[t]he general test of whether an independent intervening act, which operates to produce an injury, breaks the chain of causation is the foreseeability of that act.' . . . However, as explained by our Supreme Court . . . the foreseeability test is twofold relating both to the act and the nature of harm suffered . . . ") (internal citations omitted); Bigbee v. Pacific Tel. & Tel. Co., 34 Cal.3d 49, 55-56 (1983) ("Ordinarily, foreseeability is a question of fact for the jury. It may be decided as a question of law only if, "under the undisputed facts there is no room for a reasonable difference of opinion.'") (internal citation omitted).  In Bigbee, the court stated that:

In pursuing this inquiry, it is well to remember that "foreseeability is not to be measured by what is more probable than not, but includes whatever is likely enough in the setting of modern life that a reasonably thoughtful [person] would take account of it in guiding practical conduct." (2 Harper & James, Law of Torts, supra, § 18.2, at p. 1020.) One may be held accountable for creating even "'the risk of a slight possibility of injury if a reasonably prudent [person] would not do so.'" ( Ewart v. Southern Cal. Gas Co. (1965) 237 Cal.App.2d 163, 172 [46 Cal.Rptr. 631], quoting from Vasquez v. Alameda (1958) 49 Cal.2d 674, 684 [321 P.2d 1] (dis. opn. of Traynor, J.); see also Crane v. Smith (1943) 23 Cal.2d 288, 299 [144 P.2d 356]; see generally, Rest.2d Torts, § 291.) Moreover, it is settled that what is required to be foreseeable is the general character of the event or harm - e.g., being struck by a car while standing in a phone booth - not its precise nature or manner of occurrence. ( Taylor v. Oakland Scavenger Co. (1941) 17 Cal.2d 594, 600 [110 P.2d 1044]; Gibson v. Garcia (1950) 96 Cal.App.2d 681, 684 [216 P.2d 119]; see generally, Rest.2d Torts, § 435, subd. 1, com. a.)

Bigbee, 34 Cal.3d at 57-58 ("Here, defendants placed a telephone booth, which was difficult to exit, in a parking lot 15 feet from the side of a major thoroughfare and near a driveway. Under these circumstances, this court cannot conclude as a matter of law that it was unforeseeable that the booth might be struck by a car and cause serious injury to a person trapped within.").

Roto-Rooter argues that the intentional and reckless actions of Plaintiff and Ocansey could not have been foreseen or anticipated by Roto-Rooter, and therefore, Roto-Rooter cannot be liable. In Stultz v. Benson Lumber, 6 Cal.2d 688 (1936), the defendant manufactured defective boards that were used in scaffolding, and the defective condition of the board as well as its unsuitability for the purpose of scaffolding was known to the end user who still used it for that purpose.  The user's negligence in constructing a scaffolding with supplies known to be defective terminated the manufacturer's liability.  Further, in Premo v. Grigg, 237 Cal.App.2d 192 (1965), the decedent, a child, suffered burns and died from falling into a bucket of hot water used by her father in his janitorial job.  The court  there found that the defendant restaurant was not aware that the decedent's father was using the water at full heat, rather than diluting it with cold water, so there was no liability on the part of the restaurant.  The Stultz and Premo cases, however, are inapposite here. There is no evidence that Plaintiff knew that the water heater was defective, yet used it anyway, thereby superceding Roto-Rooter's liability.

Roto-Rooter argues, however, that like in Stultz and Premo, Roto-Rooter could not have foreseen that employees at McGarvey House would disregard their policies of stopping showers when the temperature was too hot or that an employee would commit a crime against Ms.

15

**United States District Court**
For the Northern District of California

1   Rodriguez.  However, a reasonable jury could determine, as Plaintiff argues, that the intervening act,

2   showering with water from the water heater, and the resulting harm, scalding from the hot water,

3   were foreseeable to Roto-Rooter, which provides plumbing services.  Plaintiff argues that the

4   alleged failure of Plaintiff to follow its showering policy did not bear on whether it was foreseeable

5   to Roto-Rooter that water from its water heater would be used for showers.  Moreover, there is a

6   dispute as to whether showers were stopped.  See Ferguson Decl. Ex. R at 96-97 (showers stopped

7   after the incident); Ompoc Decl. Ex. B (supposed to stop showers before the incident).  Further,

8   Plaintiff argues that the criminal conduct by Ocansey occurred only after the shower, when she left

9   Ms. Rodriguez to sleep with her injuries, yet the foreseeable conduct, the showering, occurred

10  before that criminal conduct.  Although Roto-Rooter's plumbing technician, Campbell, testified that

11  he did not know that the McGarvey House was a residential care facility for severely disabled adults,

12  there is evidence that the McGarvey House had a commercial account with Roto-Rooter such that

13  Roto-Rooter would know the use of the house and should have made sure its technician did too.

14  Finally, there is a dispute of fact, as described above, as to whether the fact that staff failed to timely

15  call 911 actually increased the injuries to Ms. Rodriguez.

16      Roto-Rooter points out that for two days after the installation of the water heater, there were

17  normal temperature readings.  Also, Roto-Rooter notes that Porche adjusted the water heater

18  temperature at least two times, and that Plaintiff has a policy of stopping showers when the

19  temperatures are too high.  This evidence, however, is consistent with the existence of a triable issue

20  of fact as to the foreseeability of Ms. Rodriguez's injuries.

21      The question of foreseeability is generally one for the jury.  This is not a case like Stultz and

22  Premo in which the injuries and harm were so extraordinary as to cut off liability.  Because there is a

23  triable issue of fact as to what was foreseeable, summary judgment is denied on this ground.

24  **D.      Conclusion**

25      Accordingly, Roto-Rooter's Motion for Summary Judgment is denied.

26  **Leonard Valve's Motion for Summary Judgment**

27      Leonard Valve moves for summary judgment on the grounds that: (1) Plaintiff will be unable

28  to demonstrate that any portion of the settlement of the underlying action represents comparative

United States District Court
For the Northern District of California

1   negligence of Leonard Valve because Plaintiff failed to allocate the settlement according to the

2   claims in the underlying case; (2) Plaintiff did not obtain a release of Plaintiff's claims against

3   Leonard Valve; (3) Plaintiff's negligence claim fails because there is no evidence of design or

4   manufacturing defect or evidence of failure to warn; and (4) Leonard Valve acted with reasonable

5   care in designing and manufacturing the mixing valve and provided adequate warnings.

6   **A.      Additional Facts regarding Leonard Valve**

7           The water heater at the McGarvey House was attached to a Leonard Valve Model 110

8   tempering valve.  Leonard Valve began manufacturing the Model 110 tempering valve in the 1950's

9   and ceased manufacturing it in 1995.  Pender Decl. Ex. G at 4, 14.  The qualities of the metal used in

10  the Model 110 prevent or limit rust and corrosion.  Pender Decl. Ex. H at 10.  Leonard Valve

11  connected each Model 110 produced to a known hot water source with a temperature of 135 degrees,

12  and employees then measured the temperature of the water on  the outlet side of the Model 110 to

13  ensure that the water temperature did not exceed 110 degrees.  Pender Decl. Ex. H at 23.

14          Res-Care California (dba RCCA Services) did not know when the mixing valve was installed

15  at the McGarvey House, and believes that it may have been installed during a retrofit of the

16  McGarvey House in or around October 1995.  Pender Decl. Ex. J at 5.  RCCA has no information

17  about any persons or companies (aside from Roto-Rooter in May 2004) that inspected or tested the

18  valve.  Pender Decl. Ex. J at 7-8.  RCCA does not know precisely how the valve was connected to

19  the hot water heater as of the day of the incident.  Pender Decl. Ex. J at 6.

20          The valve served the bath and shower spigots at the McGarvey House.  Pender Decl. Ex. J at

21  7.  With respect to the Model 110, Leonard Valve's product catalog stated that: "Leonard's Model

22  110 is a low cost, easily installed tempering valve which can keep hot water consumption low

23  reducing fuel waste.  The Model 110 automatically mixes the hot water supply with cold water to

24  deliver tempered water to fixtures."  Pender Decl. Ex. L.  The product catalog also stated:

25              Warning!  This is a tempering valve only . . . it is not designed for direct showering
            or bathing applications.  It is not an 'anti scald' device."  Id.  The packaging
26          instructions state: "After Installation Deliver to Owner's Personnel . . After 30 to 60
            days of normal operation, check the performance of the valve, disassemble the valve
27          (per the instructions) and inspect the internal parts . . . Establish a periodic
            maintenance schedule to reinspect this valve at intervals no greater than every six to
28          twelve months!

17

Pender Decl. Ex. M.  There is also a warning label attached to the Model 110 valves, including the valve at issue in this case, which read:

> This mixing valve is equipped with an adjustable high temperature limit stop factory set at approximately 110F with an incoming hot water supply temperature of 135F.  If incoming hot water on the job is higher than 135F, the valve will deliver water in excess of 110F and the high temperature limit stop must be reset by the installer . . . This is a line tempering valve which cannot be used for direct showering or bathing applications.  It is not an anti-scald device!  This is a control device which must be cleaned and maintained on a regular basis.

Pender Decl. Ex. N.

The Model 110 was not certified to meet any industry standards, including the American Society of Sanitary Engineering.  Ferguson Decl. Ex. I at 136-37.  Leonard Valve designed its Model 110 valve in the 1950's and although it changed the warnings and labels over the years, it did not alter the physical design of the product.  Ferguson Decl. Ex. I at 87-88, 101, 115, 131.  Leonard Valve had developed alternative designs prior to 1995 for the valve, as it began phasing out the Model 110 in 1993, in favor of other products that were certified to industry standards.  Ferguson Decl. Ex. I at 120, 190.  Leonard Valve continued to sell the Model 110 without recalling it or warning users about the inferior product.  Id.  The Model 110 came off the market in 1995 in favor of a product that met industry standards.  Ferguson Decl. Ex. I at 136-37, 154-55.

**B.    Discussion**

**1.    Failure to allocate settlement**

For the reasons stated above with respect to Roto-Rooter, and as addressed below, Leonard Valve's motion for summary judgment on this issue is denied.  Additional arguments raised by Leonard Valve in its briefs related to this issue do not change the result.

**2.    Failure to obtain release**

Leonard Valve argues that a tortfeasor who settles a claim such as Plaintiff is not entitled to contribution from another tortfeasor such as Leonard Valve whose liability is not explicitly extinguished in the settlement agreement through a release.  See, e.g., Pearson Bros. Co., Inc. v. Allen, 476 N.E.2d 73 (Ill. 1985) (citing state statute: "'A tortfeasor who settles with a claimant pursuant to paragraph (c) is not entitled to recover contribution from another tortfeasor whose liability is not extinguished by the settlement.' (Ill.Rev.Stat.1983, ch. 70, par. 302(e))."); U.S. v.

18

Sunoco, Inc., 644 F. Supp. 2d 566, 576 (E.D. Pa. 2009) (citing state statute: "While payment is a prerequisite to a money judgment for contribution, the case law cited above makes it clear that the party seeking contribution must also extinguish the liability of the other joint tortfeasors to the injured party in order to bring a separate contribution claim."); Martin v. CSX Transp., Inc., 617 F. Supp. 2d 662, 666 (N.D. Ohio 2009) (citing state statute: "'a tortfeasor who enters into a settlement with a claimant is not entitled to contribution from another tortfeasor whose liability for the injury or loss to person or property ... is not extinguished by the settlement' . . . ").  The out-of-state cases cited by Leonard Valve rely on state laws other than California's and Leonard Valve cites no comparable California law on the release issue.  Thus, the failure to obtain a release does not support summary judgment in favor of Leonard Valve.

Leonard Valve cites Morgan Creek Residential v. Kemp, 153 Cal.App.4th 675, 684-85 (2007) for the argument that principles of contribution allow for recovery only when a settling defendant pays in excess of its pro rata share of liability:

> "A claim for contribution ... stems from a legally recognized right forged from principles of equity and natural justice. [Citations.] The right of contribution, although necessarily related to some former transaction or obligation, exists as an entirely separate contract implied by law. [Citation.] In situations where two or more parties are jointly liable on an obligation and one of them makes payment of more than his share, the one paying possesses a new obligation against the others for their proportion of what he has paid for them. [Citation.]" . . . .  Under fundamental principles of equity, a person who has paid no more than his or her just proportion of the debt cannot secure contribution from a codebtor, even if the codebtor has paid nothing. [Citations.] As a corollary to this rule, [the California Supreme Court] has held that equality of liability among persons whose respective situations are not equal is inequitable."

Morgan Creek, 153 Cal.App.4th at 684-85.  Leonard Valve argues that here, the evidence of Plaintiff's Rule 30(b)(6) witness demonstrates that the settlement reflected only the conduct of Res-Care and its employees, and that therefore, there are no rights of contribution because the settlement was not on behalf of Leonard Valve.  See Ferguson Decl. Ex. U at 34 ("Q: Did the 8.5 million dollars in settlement contain any funds that reflected conduct of parties other than Res-Care and its employees?  . . .  A: No.").

Plaintiff, however, argues that Leonard Valve's reliance on the Rule 30(b)(6) testimony is misplaced because even though the witness testified that Res-Care paid the entire $8.5 million and

1   the amount did not consist of any funds related to conduct from other entities, his statement meant

2   only that Res-Care paid the money, not that the settlement was only for the conduct of Res-Care,

3   RCAA and Ocansey.  Because as described above, the testimony is arguably subject to Plaintiff's

4   interpretation when the evidence is viewed in the light most favorable to Plaintiff, a reasonable jury

5   could find that when Plaintiff settled the lawsuit it paid for the liability of all concurrent tortfeasors,

6   including Leonard Valve.  Thus, summary judgment is denied on this issue.

7   **3.     Design or manufacturing defect or failure to warn**

8   Plaintiff contends in the complaint that it is entitled to indemnity from Leonard Valve on the

9   basis that the tempering valve was negligently designed, manufactured and sold, and that Leonard

10   Valve failed to warn consumers of that negligent design, rendering the product dangerous, hazardous

11   and unsafe for its intended use.  Compl. ¶ 51.

12   **a.     Manufacturing defect**

13   "In general, a manufacturing or production defect is readily identifiable because a defective

14   product is one that differs from the manufacturer's intended result or from other ostensibly identical

15   units of the same product line."  Barker v. Lull Engineering Co., Inc., 20 Cal.3d 413, 429 (1978)

16   ("For example, when a product comes off the assembly line in a substandard condition it has

17   incurred a manufacturing defect.").

18   Leonard Valve argues that there is no triable issue of fact as to manufacturing defects of the

19   Model 110.  Specifically, Leonard Valve points to evidence that the valve at issue, along with all

20   other Model 110 valves, had the same specifications.  See Pender Decl. Ex. M.  Further, the valve at

21   issue, along with other Model 110 valves, automatically mixed hot water with cold water to deliver

22   water to the fixture that is usually at 110 degrees.  Id.  The product literature for the valve at issue

23   and all Model 110 valves states that it is not an anti-scald device and that it may deliver water hotter

24   than 110 degrees if water greater than 135 degrees is supplied to the valve.  Id. Ex. N.  According to

25   the warning labels, the valves were specifically not to be used for direct showering and bathing

26   applications.  Id. Ex. M, N.  Leonard Valve argues that there is no evidence that the subject valve

27   was defective when it was manufactured.  Further, Leonard Valve's response to special interrogatory

28   10 states:

> None of the component parts of the Leonard Valve Company Model 110 are susceptible to rust or corrosion and should work indefinitely under proper installation, conditions and maintenance.  The responding party is not aware of any problems or occurrences of rust or corrosion of the model 110, even if it was not properly installed, maintained, used and regularly inspected and cleaned.

Ferguson Decl. Ex. O at Spec. Int. 10.  There is evidence, however, that the bi-metallic coils from the valve from the McGarvey House were corroded and rusted.  See George Decl. Ex. B at 8-9.

Plaintiff has not presented any evidence that the valve was properly maintained or that it was not installed as an anti-scald device.  See Pender Decl. Ex. J at Spec. Int. 3, 5, 8.  Even viewing the evidence in the light most favorable to Plaintiff, there is no triable issue of fact as to whether the valve was defectively manufactured.  Specifically, there is evidence that the valve at issue rusted and corroded, but there is also no evidence that Plaintiff maintained the valve.  Leonard Valve's statement in its discovery response that it was not aware of any rust or corrosion in valves that are not maintained goes to notice to Leonard Valve, and does not establish that there were no occurrences of rust or corrosion.  Thus, summary adjudication is granted as to the manufacturing defect claim.

**b.    Design defect**

The California Supreme Court has stated:

> [A] product may be found defective in design, so as to subject a manufacturer to strict liability for resulting injuries, under either of two alternative tests. First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.

Barker, 20 Cal.3d at 432.  Under the consumer expectations test, "a plaintiff is required to produce evidence of the 'objective conditions of the product' as to which the jury is to employ its 'own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.'"  Arnold v. Dow Chemical Co., 91 Cal.App.4th 698, 717 (2001).  Further, "the consumer expectations test is reserved for cases in which the everyday experience of the product's users permits a conclusion that the product's design violated minimum safety

21

assumptions, and is thus defective regardless of expert opinion about the merits of the design."

Soule v. General Motors Corp., 8 Cal.4th 548, 567 (1994); see also Barker, 30 Cal.3d at 429 ("First,

our cases establish that a product may be found defective in design if the plaintiff demonstrates that

the product failed to perform as safely as an ordinary consumer would expect when used in an

intended or reasonably foreseeable manner.").  The Soule court further held that where the consumer

expectation test applies, evidence of the relative risks and benefits of the design is irrelevant and

inadmissible: "If the facts permit such a conclusion, and if the failure resulted from the product's

design, a finding of defect is warranted without any further proof.  The manufacturer may not defend

a claim that a product's design failed to perform as safely as its ordinary consumers would expect by

presenting expert evidence of the design's relative risks and benefits."  Id. at 566.

Even if a product satisfies the first test, if the product's design embodies "excessive

preventable danger," or, in other words, that the "risk of danger inherent in the challenged design

outweighs the benefits," the product may still be defective under the second risk-benefit test.

Hansen v. Sunnyside Prods., Inc., 55 Cal.App.4th 1497, 1512 (1997).  "'Excessive' preventable

danger logically includes consideration of package warnings to determine the likelihood that harm

will occur."  Id. .

### i.    Consumer expectations

Leonard Valve points to the product catalog, the packaging instructions and the warning

labels as evidence that the valve did not fail to perform as safely as an ordinary consumer would

expect when used in an intended or reasonably foreseeable manner.  The evidence shows that the

Model 110 had a warning that it was not to be used in showering or bathing applications and was not

to be used as an anti-scald device.  Leonard Valve argues that Plaintiff admitted that the valve was

not used as it was intended because it was used to deliver water to shower and bath lines.  Leonard

Valve argues that it was not reasonably foreseeable that Plaintiff would use the valve in

contravention of all the warnings.

Leonard Valve notes that Plaintiff only has knowledge of a possible installation date in 1995,

and that there are no records of any maintenance or cleaning from that time until after the incident.

The instructions and warning labels mandate maintenance every 6-12 months, but Plaintiff has not

22

United States District Court
For the Northern District of California

produced evidence or argued that it did any kind of regular maintenance.

Finally, Leonard Valve argues that there is no merit to Plaintiff's argument that a safety device should have been affixed to the valve to prevent hot water flow in the event of corrosion. Leonard Valve notes that the warning labels indicate that if excessively hot water flows to the valve, the water coming out of the valve will exceed 110 degrees and possibly up to 180 degrees. Thus, Leonard Valve argues that delivery of water hotter than 110 degrees from the valve is not a design defect and is in fact expected if excessively hot water is delivered to the valve. Leonard Valve argues that it was not reasonably foreseeable that Plaintiff would use the valve in disregard of the warnings and labels, so under the consumer expectation test, Plaintiff cannot maintain its design defect claim.

Even viewing the evidence in the light most favorable to Plaintiff, there is no triable issue of fact as to the consumer expectations test for the design defect claim. Moreover, there has been no showing that this is a case in which the consumer expectations test would apply, that is, where the every day experience of a user "permits a conclusion that the product's design violated minimum safety assumptions." Soule, 8 Cal.4th at 567.

### ii.    Risk-benefit analysis

The Barker Court stated:

> Because most of the evidentiary matters which may be relevant to the determination of the adequacy of a product's design under the "risk-benefit" standard - e.g., the feasibility and cost of alternative designs - are similar to issues typically presented in a negligent design case and involve technical matters peculiarly within the knowledge of the manufacturer, we conclude that once the plaintiff makes a prima facie showing that the injury was proximately caused by the product's design, the burden should appropriately shift to the defendant to prove, in light of the relevant factors, that the product is not defective.

Barker, 20 Cal.3d at 431. Although there is some overlap between design defect and negligent design, the claims are not the same, as seems to be suggested by Leonard Valve. See Barker, 20 Cal.3d at 434 ("It is true, of course, that in many cases proof that a product is defective in design may also demonstrate that the manufacturer was negligent in choosing such a design. As we have indicated, however, in a strict liability case, as contrasted with a negligent design action, the jury's focus is properly directed to the condition of the product itself, and not to the reasonableness of the

1    manufacturer's conduct.").

2         Plaintiff argues that the design of the valve was defective because it utilized a bimetallic

3    mechanism that is weaker and more susceptible to rust and corrosion, as well as to seizure and

4    related failure, than valves utilizing a liquid sensing element.  See George Decl. Ex. B at 4-9.

5    Plaintiff argues that as a result of the defective design, the valve at the McGarvey House seized and

6    failed, and was delivering hot water to the residence that was untempered by cold water, which led

7    to Ms. Rodriguez's injuries.  See Ferguson Decl. Ex. K at 67-70.  Plaintiff argues that Leonard

8    Valve's claim that the valve was performing within its design specifications is disputed.

9    Specifically, the evidence shows that the valve may deliver water in excess of 110 degrees and as

10   hot as 180 degrees.  Thus, Plaintiff argues that even if the input temperature from the water heater

11   had been 160 degrees, that would have had a minimal effect on the output temperature from the

12   valve (i.e., 3-4 degrees) based on testimony from Leonard Valve's witnesses.  Plaintiff argues that

13   the valve could not have been functioning normally when Ms. Rodriguez was injured and therefore,

14   the failure was at least a partial cause of the injuries. Plaintiff has met her prima facie burden of

15   showing that the injury was caused by the product's design.

16        Leonard Valve has the burden of proving that the benefits of the design outweigh the risk of

17   danger.  Leonard Valve could satisfy this burden by introducing evidence of:

18            . . . the gravity of the danger posed by the challenged design, the likelihood that such
             danger would occur, the mechanical feasibility of a safer alternative design, the
19           financial cost of an improved design, and the adverse consequences to the product
             and to the consumer that would result from an alternative design.
20

21   Barker, 20 Cal.3d at 431.  Here, Leonard Valve has provided little evidence to meet its burden,

22   although Leonard Valve does appear to argue that its warnings reduced the likelihood of injury.

23        By contrast, Plaintiff has provided expert testimony regarding an alternative design that

24   would be less susceptible to rust, corrosion and calcification and thus, less susceptible to failure.

25   See George Decl. Ex. B at 4-9.  There is evidence that later models of the valve met industry

26   standards.  See Ferguson Decl. Ex. I at 191-92.  Further, Leonard Valve was phasing out the Model

27   110 for approximately two years before the valve at issue was installed.  Id. at 190.  Viewing the

28   evidence in the light most favorable to Plaintiff, there is a triable issue of fact that Leonard Valve

United States District Court
For the Northern District of California

24

1   has failed to show that the benefits of the valve outweigh the risks, even accepting Leonard Valve's

2   argument that the warnings reduced the likelihood of injury at least to some extent.

3                c.      **Adequate warning**

4        In a failure to warn case based on negligence:

5        . . . a plaintiff [must] prove that a manufacturer or distributor did not warn of a
         particular risk for reasons which fell below the acceptable standard of care, i.e., what
6        a reasonably prudent manufacturer would have known and warned about.

7   Anderson v. Owens-Corning Fiberglass Corp., 53 Cal.3d 987, 1002 (1991).  "[W]hen a sufficient

8   warning is given, 'the seller may reasonably assume that it will be read and heeded; and a product

9   bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it

10  unreasonably dangerous.'"  Johnson v. American Standard, Inc., 43 Cal.4th 56, 65 (2008).  Although

11  the adequacy of a warning label can be determined on summary judgment (see Temple v. Velcro

12  USA, Inc., 148 Cal.App.3d 1090, 1095 (1983)), the adequacy of a warning is usually a question of

13  fact (see Schwoerer v. Union Oil Co., 14 Cal.App.4th at 111; Torres v. Xomox Corp., 49

14  Cal.App.4th at 21).

15       In support of its argument that its warnings were sufficient, Leonard Valve quotes each one

16  of its warnings and labels, including the one attached to the subject valve at issue.  Leonard Valve

17  argues that Plaintiff had notice of the warning because it was attached to the subject valve at the

18  McGarvey House.

19       Plaintiff first argues that the instructions are ambiguous.  The  product catalog states:

20       WARNING!  THIS IS A TEMPERING VALVE ONLY . . . IT IS <u>NOT</u> DESIGNED
21       FOR DIRECT SHOWERING OR BATHING APPLICATIONS.  IT IS <u>NOT</u> AN
         ANTI-SCALD DEVICE!  IT IS DESIGNED FOR POINT OF USE LAVATORY
22       LINE CONTROL (HAND WASHING), RESIDENTIAL AND SOLAR HOT
         WATER SYSTEMS, INDUSTRIAL PROCESSES AND SPECIALIZED HEATING
23       SYSTEMS.

24  Pender Decl. Ex. M (emphasis in original).  The installation instructions state:

25       WARNING!  THIS IS A TEMPERING VALVE ONLY . . . IT IS <u>NOT</u> DESIGNED
26       FOR DIRECT SHOWERING OR BATHING APPLICATIONS.  IT IS <u>NOT</u> AN
         ANTI-SCALD DEVICE!  IT IS DESIGNED FOR POINT OF USE LAVATORY
27       LINE CONTROL (HAND WASHING), RESIDENTIAL AND SOLAR HOT
         WATER SYSTEMS, INDUSTRIAL PROCESSES AND SPECIALIZED HEATING
28       SYSTEMS.  IT IS NOT TO BE USED AS A MASTER CONTROL ON A
         RECIRCULATED HOT WATER SYSTEM!

**United States District Court**
For the Northern District of California

25

Id.  Plaintiff argues that the instructions are ambiguous because the valve was permitted to be used in "residential . . hot water systems" per the instructions, yet Leonard Valve argues that the valve should not have been used in showering or bathing applications.  Plaintiff also argues that the phrase "direct showering or bathing applications" is vague in the context of the instructions.  See Ferguson Decl. Ex. K at 118-19.  Roto-Rooter's plumbing technician, Mr. Weider, who discovered the corroded mixing valve at the McGarvey House, testified that he has performed approximately 100 water heater installations and he is familiar with mixing valves, see Ferguson Decl. Ex. K at 24, 57-58, yet he was unable to explain the meaning of the phrase, "direct showering or bathing applications," instead stating: "I don't know the -- the technical definition of it.  I'm assuming it is referring to devices at the shower itself."  See Ferguson Decl. Ex. K at 119.  There is also evidence that Leonard Valve's president, Gregory Wilcox, coined the phrase, "direct showering or bathing application."  See Ferguson Decl. Ex. I at 32.  Wilcox also testified that the Model 110 valve should be used with an additional temperature control installed between Model 110 and the shower fixture. See Ferguson Decl. Ex. I at 121-22.  But the installation instructions do not call for an additional valve.  See Ferguson Decl. Ex. I at 123-124, 126.

Although this is a close question, based on the authority that the adequacy of a warning is usually a question of fact for the jury, and viewing the evidence in the light most favorable to Plaintiff, there is a triable issue of fact that Leonard Valve's instructions were at least ambiguous.

Plaintiff also argues that the warnings were insufficient.  The installation instructions warned:

> WARNING!  THIS MIXING VALVE IS EQUIPPED WITH AN ADJUSTABLE HIGH TEMPERATURE LIMIT STOP FACTORY SET AT APPROXIMATELY 110F WITH AN INCOMING HOT WATER SUPPLY OF 135F.  IF INCOMING HOT WATER ON THE JOB IS HIGHER THAN 135F, THE VALVE WHEN TURNED TO FULL HOT MAY DELIVER WATER IN EXCESS OF (OR LOWER THAN) 110F, AND THE HIGH TEMPERATURE LIMIT STOP MUST BE RESET BY THE INSTALLER.

Pender Decl. Ex. M.  The warning label on the valve itself stated:

> WARNING!  THIS MIXING VALVE IS EQUIPPED WITH AN ADJUSTABLE HIGH TEMPERATURE LIMIT STOP FACTORY SET AT APPROXIMATELY 110F WITH AN INCOMING HOT WATER SUPPLY OF 135F.  IF INCOMING

HOT WATER ON THE JOB IS HIGHER THAN 135F, THE VALVE WHEN TURNED TO FULL HOT MAY DELIVER WATER IN EXCESS OF (OR LOWER THAN) 110F, AND THE HIGH TEMPERATURE LIMIT STOP MUST BE RESET BY THE INSTALLER. . . . THIS IS A LINE TEMPERING VALVE AND CANNOT BE USED FOR DIRECT SHOWERING OR BATHING APPLICATIONS.  IT IS NOT AN ANTI-SCALD DEVICE!  THIS IS A CONTROL DEVICE WHICH MUST BE CLEANED AND MAINTAINED ON A REGULAR BASIS (SEE MAINTENANCE GUIDE).

Id. at Ex. N.  The maintenance guide and record states:

AFTER INSTALLATION, DELIVER TO THE OWNER'S MAINTENANCE PERSONNEL.  After 30-60 days of normal operation, check the performance of the valve, dissemble the valve (per the instructions) and inspect the internal parts. . . . ESTABLISH A PERIODIC MAINTENANCE SCHEDULE TO REINSPECT THIS VALVE AT INTERVALS NO GREATER THAN EVERY SIX TO TWELVE MONTHS! . . . If there is evidence of inconsistent performance or of any deposit on the internal parts, clean the valve thoroughly (per the instructions), replace parts if necessary, reassemble the valve and make certain it is functioning properly. Recheck and if necessary, reset the high temperature limit stop (per Warning tag).

Id. at Ex. M.  Plaintiff argues that the warnings are insufficient in two ways: (1) Leonard Valve failed to indicate that the valve would lower output temperatures a certain number of degrees below the water heater temperature; and (2) Leonard Valve should have warned of the scalding consequences for failing to maintain the valve.  Plaintiff's arguments are without merit.  It is common sense that if the warnings state that water coming into the valve in excess of 135 degrees will result in water delivery to fixtures in excess of 110 degrees, water hotter than 135 degrees flowing to the valve would result in even hotter water delivery.  Further, even though Plaintiff's expert opined that Leonard Valve failed to specifically describe the consequences of failing to maintain the valve (see Wolf Decl. Ex. B at 5), it is common sense that the failure to maintain the valve as described in the maintenance guide could result in the improper function of the valve, including possible scalding.  Even viewing the evidence in the light most favorable to Plaintiff, there is no triable issue of fact as to the sufficiency of the warning regarding maintenance.

Leonard Valve argues that the "sophisticated user defense" precludes liability for failure to warn.  See Fierro v. Intermnational Hervester Co., 127 Cal.App.3d 862, 866 (1982) (noting in dicta that the defendant, the manufacturer of a truck, had no duty to warn plaintiff's deceased of the hazards of the truck's fuel tank design where the truck's features were known to or readily observable by Luer, employer of the deceased:  "In any event, there was nothing about the

International unit which required any warning to Luer. A sophisticated organization like Luer does not have to be told that gasoline is volatile and that sparks from an electrical connection or friction can cause ignition."); see also In re Asbestos Cases, 543 F. Supp. 1142, 1151 (N.D. Cal. 1982) (denying motion to strike affirmative defense: ". . . defendants assert the affirmative defense that the Navy was a 'sophisticated user' of asbestos products-that is, that the Navy, as an employer, was as aware of the dangers of asbestos as were defendants and that the Navy nonetheless misused the products, thereby absolving the defendants of liability for failure to warn the Navy's employees of the products' dangers."). The defense has been adopted in California. See Johnson, 43 Cal.4th at 67 ("Although manufacturers are responsible for products that contain dangers of which the public is unaware, they are not insurers, even under strict liability, for the mistakes or carelessness of consumers who should know of the dangers involved. Accordingly, we adopt the defense in California.").

Leonard Valve argues that RCCA was the user of the valve, and that RCCA is a subsidiary of Res-Care, which is one of the largest providers of complex services involving dependent adult care. Leonard Valve further argues that the McGarvey House housed staff that were solely responsible for maintenance and operation of the building, and in particular, the staff recorded hot water temperatures daily. Thus, Leonard Valve argues that RCCA was sophisticated enough to know the importance of maintenance and proper use of a tempering valve. However, the defense of a sophisticated user under the circumstances of this case is a factual issue for the jury.

### 4. Reasonable care

The focus of a claim for negligence in a products liability case is whether the manufacturer acted with reasonable care. Cf. Barker, 20 Cal.3d at 434 ("Thus, the fact that the manufacturer took reasonable precautions in an attempt to design a safe product or otherwise acted as a reasonably prudent manufacturer would have under the circumstances, while perhaps absolving the manufacturer of liability under a negligence theory, will not preclude the imposition of liability under strict liability principles if, upon hindsight, the trier of fact concludes that the product's design is unsafe to consumers, users, or bystanders."). To prevail on a negligence claim, Plaintiff must show that Leonard Valve owed a legal duty, that it breached the duty, and that the breach was a

United States District Court
For the Northern District of California

1   proximate or legal cause of the injuries.  See Merrill v. Navegar, Inc., 26 Cal.4th 465, 477 (2001).

2   Plaintiff argues that Leonard Valve cannot prove that it behaved reasonably as a matter of law

3   because due care is generally a question of fact for the jury.  6 Witkin, Summary of California Law,

4   § 866, at p. 93.

5              **a.**        **Negligence in manufacturing**

6         Leonard Valve argues that it acted with reasonable care in manufacturing the Model 110

7   subject valve.  See Valentine v. Baxter Healthcare Corp., 68 Cal.App.4th 1467, 1484-85 (1999)

8   (citing jury instruction that: "manufacture[r] of a product that is reasonably certain to be dangerous

9   if negligently made has a duty to exercise reasonable care in the ... testing and inspection of that

10  product ... so that the product may be safely used in a manner and for a purpose for which it was

11  made.").  Leonard Valve points to evidence that it tests every Model 110 valve that is produced by

12  connecting the valve to a known hot water source with a temperature of 135 degrees, after which

13  employees measure the temperature of water on the outlet side of the valve to ensure it does not

14  exceed 110 degrees.  Pender Decl. Ex. H. at 23-24.  This method of testing was the criterion for

15  accepting or rejecting the valve.  Id.

16        However, Plaintiff points out that the valve was designed to temper water as hot as 180

17  degrees (see Pender Decl. Ex. M ("The Model 110 automatically mixes the hot water supply (120F

18  to 180F) with cold water to deliver tempered water (usually at 110F) to fixtures.")), yet there was

19  apparently no testing done at the high end of the input temperature range.  Further, Leonard Valve

20  claims that the output temperature of the mixing valve should only change by one degree for every

21  seven degree change in input temperature (see Ferguson Decl. Ex. I at 119), but there is no evidence

22  that there was any testing done to confirm this.  Finally, there is no evidence that Leonard Valve

23  conducted a visual inspection of the valves or the internal mechanism of the  valve, yet in this case,

24  the subject valve had extensive rust, corrosion and calcification.  See George Decl. Ex. B at 5-9.

25  Plaintiff's expert opined that the testing was inadequate because there were no specific tests to

26  determine if the valve would function properly in its installation, nor were there tests of the

27  individual parts of the valve before they were manufactured into the valve nor any final product

28  testing or field testing.  See Wolf Decl. Ex. B at 5-6.

**United States District Court**
For the Northern District of California

1    Thus, viewing the evidence in the light most favorable to Plaintiff, there is at least a triable

2    issue of fact that Leonard Valve negligently manufactured the Model 110 valve.  Leonard Valve's

3    motion for summary judgment on the negligent manufacturing claim is denied.

4         **b.**     **Negligent design**

5    The California Supreme Court has stated:

6    > The duty of a manufacturer with respect to the design of products placed on the
     > market is defined in the Restatement Second of Torts, section 398: 'A manufacturer

7    > of a chattel made under a plan or design which makes it dangerous for the uses for
     > which it is manufactured is subject to liability to others whom he should expect to use

8    > the chattel or to be endangered by its probable use for physical harm caused by his
     > failure to exercise reasonable care in the adoption of a safe plan or design.' Thus, the

9    > manufacturer must use reasonable care "to so design his product as to make it not
     > accident-proof, but safe for the use for which it was (sic) intended." (<u>Varas v. Barco</u>

10   > <u>Mfg. Co.</u> (1962) 205 Cal.App.2d 246, 258, 22 Cal.Rptr. 737, 744, quoting from 76
     > A.L.R.2d 91, 94.) What is 'reasonable care,' of course, varies with the facts of each

11   > case, but it involves a balancing of the likelihood of harm to be expected from a
     > machine with a given design and the gravity of harm if it happens against the burden

12   > of the precaution which would be effective to avoid the harm.

13   <u>Pike v. Frank G. Hough Co.</u>, 2 Cal.3d 465, 470 (1970).

14

15   Leonard Valve cites <u>Hansen</u>, 55 Cal.App.4th at 1513, for its argument that it provided

16   warnings with the subject valve and that therefore the valve's design was reasonably safe.  <u>Hansen</u>,

17   however, addressed the relevance of product warnings in the context of evaluating an alleged design

18   defect under the risk-benefit test, as described above.  Leonard Valve cites no case for the

19   proposition that warnings are relevant to determining whether a manufacturer breached a duty to

20   design a safe product.  Thus, Leonard Valve may be liable for failing to design a safe product even if

21   warnings rendered the danger obvious.  <u>See</u> <u>Putensen v. Clay Adams, Inc.</u>, 12 Cal.App.3d 1062,

22   1076-77 (1970) (noting that in addition to a duty to design safe products, a manufacturer has a duty

23   to provide adequate warnings).

24   Leonard Valve argues that it manufactured the Model 110 valve with a quality of bronze,

25   brass and stainless steel that limits rust and corrosion.  Pender Decl. Ex. H at 9-10.  Leonard Valve

26   notes that the valve was not designed for use in direct showering or bathing applications, but as a

27   "low-cost, easily installed tempering valve which can keep hot water consumption low reducing fuel

28   waste."  Pender Decl. Ex. M at LV00004.  The Model 110 was not designed to be an anti-scald

device.  <u>Id.</u>

1    Plaintiff, however, notes that Leonard Valve admits that it never considered alternative

2 designs for the Model 110 valve, nor did it test to industry standards.  See Ferguson Decl. Ex. I at

3 144, 148, 154.  Moreover, Leonard Valve replaced the Model 110 with a newer model that met

4 industry standards at around the time that the subject valve was used at the McGarvey House.  See

5 Ferguson Decl. Ex. I at 190; Ex. O at 18.  Viewing the evidence in the light most favorable to

6 Plaintiff, there is a triable issue of fact as to whether Leonard Valve was reasonable in continuing to

7 manufacture the Model 110 when alternative designs were available.

8    Plaintiff also argues that Leonard Valve was negligent because there is no evidence that it

9 ever tested the valves for the effects of long term use or foreseeable misuse, raising a triable issue of

10 fact that Leonard Valve failed to take reasonable steps to ensure that the design was safe.  See

11 Putensen, 12 Cal.App.3d at 1078 ("With respect to tests or inspections, it is well settled that where

12 an article is such that it is reasonably certain, if negligently manufactured or designed, to place life

13 and limb in peril, the manufacturer is chargeable with negligence if the defective condition could be

14 disclosed by reasonable inspection and tests, and such inspection and tests are omitted.").  Thus,

15 Leonard Valve's motion for summary judgment as to negligent design is denied.

16                **c.    Failure to warn**

17    " . . . [T]he manufacturer has a duty to use reasonable care to give warning of the dangerous

18 condition of the product or of facts which make it likely to be dangerous to those whom he should

19 expect to use the product or be endangered by its probable use, if the manufacturer has reason to

20 believe that they will not realize its dangerous condition."  Putensen, 12 Cal.App.3d at 1076-77;

21 Anderson, 53 Cal.3d at 1003 ("Stated another way, a reasonably prudent manufacturer might

22 reasonably decide that the risk of harm was such as not to require a warning as, for example, if the

23 manufacturer's own testing showed a result contrary to that of others in the scientific community.

24 Such a manufacturer might escape liability under negligence principles.").

25    Leonard Valve argues that it exercised reasonable care in providing numerous instructions

26 and warnings pertaining to maintenance and operation of the valve.  However, as stated above,

27 Plaintiff has provided evidence raising a triable issue of fact as to whether Leonard Valve's

28 warnings and instructions were adequate.  Viewing the evidence in the light most favorable to

Plaintiff, there is a triable issue of fact that Leonard Valve negligently failed to warn in this case.

Leonard Valve's motion for summary judgment on this claim is denied.

//

//

**C.      Conclusion**

Thus, Defendant Leonard Valve's Motion for Summary Judgment is denied.

**IT IS SO ORDERED.**

Dated: October 28, 2010

_Elizabeth D. Laporte_

ELIZABETH D. LAPORTE
United States Magistrate Judge