1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RES-CARE INC.,

        Plaintiff,

  v.

ROTO-ROOTER SERVICES COMPANY,

        Defendant.

_____/

No. C-09-03856 EDL

**ORDER FOLLOWING PRETRIAL CONFERENCE**

On November 10, 2010 and January 14, 2011, the Court held pretrial conferences in this case. For the reasons stated at the conferences and in this Order, the Court rules as follows on the parties' Motions in Limine.

**Plaintiff's Motions in Limine**

1.     **Plaintiff's Motion in limine to exclude admission of California Department of Health Services' ("DHS") investigation report and statement of deficiencies and plan of correction**

    A.    Statement of Deficiencies and Plan of Correction

The Statement of Deficiencies and Plan of Correction is subject to Federal Rule of Evidence 407, which forbids admission of subsequent remedial measures to prove negligence or culpability. It is therefore only admissible if offered for another purpose such as showing ownership, control, feasibility of repairs, or impeachment.

    B.    Investigative report

As stated at the November 10, 2010 pretrial conference, the motion to exclude the DHS investigation report is denied. However, the Court stated that irrelevant material from this and other

similar investigation reports should be redacted and the Court will give a limiting instruction to the jury. The parties were unable to agree on redactions for the investigative report. On January 13 and 18, 2011, the parties submitted their proposed redactions. The Court's rulings on the proposed redactions are contained in a separate order. Thus, Plaintiff's motion in limine is granted in part and denied in part.

**2.     Plaintiff's Motion in limine to exclude DHS citation and Citation Review Conference Decision**

A.     Citation

Plaintiff argues that the citation is inadmissible hearsay and is irrelevant. The Court has already ruled in the context of summary judgment that the public record exception to the hearsay rule applied to the citation. See Fed. R. Evid. 803(8). Plaintiff has made no showing to warrant a different result at trial.

The citation addresses the specific incident that is at issue in this case and is highly relevant. Although Plaintiff argues that the citation is more prejudicial that probative and should therefore be excluded pursuant to Federal Rule of Evidence 403, the Court disagrees and any prejudice can be addressed by a limiting instruction to the jury.

B.     Citation Review Conference decision

After the Department of Public Health issued its citation, Plaintiff requested a Citation Review Conference, which was held on February 2, 2006. On December 21, 2006, the hearing officer issued a decision upholding the citation. On April 5, 2007, Plaintiff filed its complaint in Superior Court asserting that the evidence did not support the findings in the Citation. See Cal. Health and Safety Code § 1428. According to Plaintiff, that action was settled without any admission that the facts alleged in the citation were accurate.

The Citation Review Conference process is an informal one, which is not governed by the California Administrative Procedure Act and so does not include the procedural protections of administrative adjudications or result in final administrative decisions. See, e.g., 9 Cal. Code Regs. § 788.14 ("The conference shall be an informal proceeding, and shall not be conducted in the manner of a judicial hearing or as a hearing under the Administrative Procedure Action (Chapter 5 [commencing with Section 11500] of Part 1 of Division 3 of Title 2 of the Government Code), and

need not be conducted according to technical rules relating to evidence and witnesses."). Further, Citation Review Conference procedures prohibit the cross-examination of witnesses. See DPH website, "Citation Review Conferences", ("During any presentation at the CRC, the participants are protected from any other party's cross-examination."), *available at* http://www.cdph.ca.gov/certlic/Pages/CitationReviewConferences.aspx. The decision to seek a CRC is voluntary, and can be immediately appealed to the Superior Court.

The Court excludes the Citation Review Conference decision pursuant to Federal Rule of Evidence 403. At the January 14, 2011 pretrial conference, Defendants stated that they did not disagree with excluding the Citation Review Conference decision. The decision may confuse the jury into thinking that there has been a finding that Plaintiff violated a statute when it appears that the Citation Review Conference process did not provide due process and was not a full hearing of the issues. The jury may substitute the judgment of the Citation Review Conference for its own, which would be highly prejudicial. The prejudice could not be adequately mitigated with a limiting instruction to the jury.

Thus, Plaintiff's motion in limine is granted in part and denied in part.

**3.      Plaintiff's Motion in limine to exclude admission and reference to the declaration and investigative report of ombudsman Lidia Church**

As stated at the November 10, 2010 pretrial conference, the motion to exclude the Ombudsman's investigation report is denied. However, the Court stated that irrelevant material from this and other similar investigation reports should be redacted and the Court will give a limiting instruction to the jury. The parties were unable to agree on redactions for the investigative report. On January 13 and 18, 2011, the parties submitted their proposed redactions. The Court's rulings on the proposed redactions are contained in a separate order. Pursuant to the concurrent order regarding redactions, Plaintiffs' motion in limine is granted in part and denied in part.

**4.      Plaintiff's Motion in limine to exclude admission and reference to a scalding incident that occurred at the J&J Care Center**

Defendants did not oppose this motion in limine. Therefore, the motion is granted as unopposed.

**5.      Plaintiff's Motion in limine to exclude references to Oretha Ocansey's mental and physical condition after the incident**

**United States District Court**
For the Northern District of California

Defendants did not oppose this motion in limine.  Therefore, the motion is granted as unopposed.

**6.      Plaintiff's Motion in limine to exclude admission of investigative reports of police and fire departments**

As stated at the November 10, 2010 pretrial conference, the motion to exclude the police and fire department investigation reports is denied.  However, the Court stated that irrelevant material from this and other similar investigation reports should be redacted and the Court will give a limiting instruction to the jury.  The parties were unable to agree on redactions for the investigative reports.  On January 13 and 18, 2011, the parties submitted their proposed redactions.  The Court's rulings on the proposed redactions are contained in a separate order.  Pursuant to the concurrent order regarding redactions, Plaintiffs' motion in limine is granted in part and denied in part.

**7.      Plaintiff's Motion in limine to exclude testimony of Juan Carlos Villela**

Juan Carlos Villela is a former employee of RCAA who worked for about three months at the McGarvey House, over one year prior to the shower incident.  At his deposition in the underlying case, Mr. Villela testified about employee training, finances, and the physical condition of the McGarvey House.  Webster Decl. Ex. P.  Plaintiff seeks to exclude this testimony on the basis that it is irrelevant and that Mr. Villela has no personal knowledge of the conditions or training at RCCA around the time of the incident.

Mr. Villela began working for Genesis Development Services in 1996, at which time Ms. Rodriguez was already attending Genesis.  Mr. Villela worked with Ms. Rodriguez at Genesis and took her on outings for eight years, and thus has personal knowledge of Ms. Rodriguez's condition and her ability to communicate pain, which is relevant to the allocation of fault and intentional conduct.  Further, during Mr. Villela's three months as a House Manager for Res-Care, he made observations of the care offered there.  However, he was not employed at the McGarvey House at the time of the scalding incident.  Mr. Villela was also hired and managed by Res-Care Administrator Christopher Brandt, the same man who hired and managed Ms. Ocansey.  Further, after leaving Res-Care, Mr. Villela went back to his work at Genesis, and therefore had ongoing contact not only with Ms. Rodriguez, but also with Res-Care employees.

To the extent that Mr. Villela has personal knowledge of Ms. Rodriguez or of the training at

4

McGarvey House, or of other similar subjects, his testimony about those facts is relevant and admissible. However, any testimony about the irrelevant circumstances at the McGarvey House, such as including among other things, issues relating to race discrimination or inadequate food at McGarvey House, is excluded pursuant to Federal Rule of Evidence 403. Accordingly, Plaintiff's motion in limine is granted in part and denied in part.

**8.     Plaintiff's Motion in limine to exclude references to Theresa Rodriguez's condition after settlement of the underlying action**

Evidence of Ms. Rodriguez's condition after the settlement is irrelevant and more prejudicial than probative. Ms. Rodriguez's life expectancy at the time of the settlement, not her actual life span after the settlement, is relevant to the question of the reasonableness of the settlement. Further, evidence of Ms. Rodriguez's condition after settlement would confuse the issues, mislead the jury, and be unfairly prejudicial. The jury must assess what a reasonable settlement was at the time of the settlement, and could become confused by hearing about Ms. Rodriguez's post-settlement demise. Accordingly, Plaintiff's motion in limine is granted.

**9.     Plaintiff's Motion in limine to exclude certain opinions of Leonard Valve expert Dr. John H. Fullerton**

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to Rule 702, a witness qualified as an expert in "scientific . . . knowledge" may testify thereto if: "(1) the testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has applied the principles and methods to the facts of the case." Fed. R. Evid. 702. For expert testimony to be admissible, it must meet three requirements: (1) evidence must be useful to the fact finder in understanding the evidence or in making factual determinations necessary to decide the ultimate issues of fact; (2) evidence must be reliable or trustworthy; and (3) the witness must be qualified to provide the fact finder with assistance. 4 Weinstein, Weinstein's Federal Evidence, § 702.02[3] (2d ed. 2005). The proponents of expert testimony have the burden of proving admissibility pursuant to Rule 702 by a preponderance of the evidence. Fed. R. Evid. 702, Advisory Committee Notes (2000 amendments).

The trial court acts as a "gatekeeper" to the admission of expert scientific testimony under Rule 702. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 579-80 (1993). The court must

United States District Court
For the Northern District of California

1   conduct a preliminary assessment to "ensure that any and all scientific testimony or evidence

2   admitted is not only relevant but reliable." Id. at 589.  This two-step assessment requires

3   consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically

4   valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied

5   to the facts in issue (the relevancy prong).  Id. at 592-93; Kennedy v. Collagen Corp., 161 F.3d

6   1226, 1228 (9th Cir. 1998); Salinas v. Amteck of Kentucky, 682 F. Supp. 2d 1022, 1029 (N.D. Cal.

7   2010).

8           Reliable testimony must be grounded in the methods and procedures of science and signify

9   something beyond "subjective belief or unsupported speculation." Daubert, 509 U.S. at 590.  In

10   Daubert, the Supreme Court outlined factors relevant to the reliability prong, including: (1) whether

11   the theory can be and has been tested; (2) whether it has been subjected to peer review; (3) the

12   known or potential rate of error; and (4) whether the theory or methodology employed is generally

13   accepted in the relevant scientific community.  Daubert, 509 U.S. at 593-94.  The Supreme Court

14   emphasized the "flexible" nature of this inquiry.  Id. at 594.  As later confirmed in Kumho Tire Co.

15   v. Carmichael, 526 U.S. 137 (1999): "Daubert's list of specific factors neither necessarily nor

16   exclusively applies to all experts or in every case. Rather the law grants a district court the same

17   broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate

18   reliability determination." Id . at 141-42.  In addition to the Daubert factors, the Ninth Circuit has

19   noted that a "very significant fact to be considered is whether the experts are proposing to testify

20   about matters growing naturally and directly out of research they have conducted independent of the

21   litigation, or whether they have developed their opinions expressly for purposes for testifying."

22   Daubert II, 43 F.3d at 1317.  If the evidence is not based upon independent research, the court must

23   determine whether there exists any "other objective, verifiable evidence that the testimony is based

24   on 'scientifically valid principles." Id. at 1317-18.  Generally, peer review meets this requirement.

25   It may also be met by:

26           precisely [explaining] how [the experts] went about reaching their conclusions and
            point[ing] to some objective source-a learned treatise, the policy statement of a
27           professional association, a published article in a reputable scientific journal or the
            like - to show that they have followed the scientific method, as it practiced by (at
28           least) a recognized minority or scientists in their field.

1

2   <u>Id</u>. at 1319.

3       The second prong of Rule 702 concerns relevancy, or "fit." <u>See</u> <u>Daubert</u>, 509 U.S. at 591.

4   Expert opinion testimony is relevant if the knowledge underlying it has a "valid ... connection to the

5   pertinent inquiry," and it is reliable if the knowledge underlying it "has a reliable basis in the

6   knowledge and experience of [the relevant] discipline." <u>Id.</u> at 592.

7       Finally, even under <u>Daubert</u>, the Court must still weigh the balancing factors of Federal Rule

8   of Evidence 403.  Rule 403 permits the exclusion of relevant evidence "if its probative value is

9   substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading

10  the jury ..." <u>Daubert</u>, 509 U.S. at 595.

11      Here, Plaintiff does not challenge Dr. Fullerton's expertise in general, but attacks several

12  specific opinions that Dr. Fullerton has made.  As described below, Plaintiff's motion in limine is

13  granted in part and denied in part.

**(1) Staffing requirements at Intermediate Care Facilities for the Developmentally Disabled/Habilitative ("ICF-DD/H") such as the McGarvey Home**

15      Plaintiff argues that Dr. Fullerton does not have any specialized knowledge regarding

16  staffing standards for ICF-DD/H, or the staffing standards/policies or resident-to-staff ratio at the

17  McGarvey at the time of the incident.  For example, Dr. Fullerton testified that he has never been a

18  medical director of an ICF-DD and the bulk of his experience has actually been with Skilled Nursing

19  Facilities ("SNFs") with between 50-200 residents.  However, Dr. Fullerton is a certified Medical

20  Director and coordinator of geriatric care for multiple long-term care facilities, including facilities

21  such as the McGarvey Home.  He oversees the care given in dementia units, residential care

22  facilities and skilled nursing facilities in the Bay Area.  He has experience both caring for patients

23  at, and acting as medical director of, Title 22-Regulated facilities that care for disabled and

24  dependent patients such as those at the McGarvey Home.  The Court concludes that Dr. Fullerton is

25  qualified to provide opinions on the staffing requirements at the McGarvey House.

**(2) The hiring practices at the McGarvey Home at and around the time of the incident and whether Res-Care met the standard of care with respect to hiring Ms. Ocansey**

27

28      Plaintiff argues that Dr. Fullerton does not have any specialized expertise or training with

**United States District Court**
For the Northern District of California

regard to hiring practices at the McGarvey House in particular or ICF-DD/H in general.  Dr. Fullerton testified that he has some experience hiring personnel for facilities like McGarvey House, through teaching and through people asking him for letters of recommendation.  Leonard Valve argues that Dr. Fullerton is qualified to testify about hiring because he has experience as a medical director of long-term care facilities, and in that role, he has reviewed facility hiring processes and had acted as an expert on staffing issues.  The Court concludes that Dr. Fullerton is qualified to testify as to hiring procedures in general.

However, Dr. Fullerton is not qualified to testify regarding Ocansey's immigration status or citizenship.  Dr. Fullerton stated in his deposition and his expert report that Plaintiff had no business hiring Ocansey who he believed was functionally illiterate (based on her lack of facility with English), and had no proof of citizenship.  In his deposition, he stated that he had not reviewed Ocansey's personnel file to see whether there was a social security number, but that he had seen a reference about her lack of proof of citizenship.  He explained that his focus on Ocansey's citizenship come from his experience that there is usually a clause in agreements for hiring caregivers that requires that the caregiver know English.  He denied that only citizens could speak English, but stated that he believes citizenship and knowledge of English are connected.  He also opined in his report that there was no serious background check of Ocansey.  There has been no showing that Dr. Fullerton is an expert as to the relationship between citizenship or immigration status and hiring practices at a residential care facility like McGarvey House.  Thus, Dr. Fullerton is barred from testifying about his opinions regarding Ocansey's citizenship or immigration status.

**(3) The temperature of the shower water at and around the time of the incident**

Although Dr. Fullerton does not have any specialized training in treating severe burns and he is not a burn causation expert, his opinions are based on the same evidence and records as Res-Care's own burn expert, Dr. Natarajan.  Dr. Fullerton testified that he is an expert in burns.  He has treated burn patients and has classified burn injuries.  He has training in burn injuries from his many years of experience dealing with elder abuse patients and sees burn injuries every few months.  Dr. Fullerton has reviewed and is familiar with the basic burn literature and opined that the most likely scenario for injury in this case, based on his expertise, was a 20-25 minute exposure to water

in the range of 110-120 degrees.  Dr. Fullerton is qualified to testify on the water temperature at the time of the incident.

**(4) Whether Oretha Ocansey intended to harm Ms. Rodriguez**

Any opinions offered by Dr. Fullerton regarding his belief that Ms. Ocansey may have intended to harm Ms. Rodriguez, are excluded because they are speculative and outside the scope of Dr. Fullerton's expertise and not helpful to the jury.

**(5) Hot water systems, thermostatic control and/or mixing valves, and/or the plumbing and hot water system at the McGarvey Home on the date of the incident**

There has been no showing that Dr. Fullerton has any expertise in plumbing or hot water systems.  Thus, Dr. Fullerton is not qualified to give opinions about the hot water or plumbing systems.

**10.     Plaintiff's Motion in limine to exclude reference to Res-Care or RCCA Services as "large" companies or by other similar references**

Defendants did not oppose this motion in limine.  Therefore, the motion is granted as unopposed and applies to all parties.

**11.     Plaintiff's Motion in limine to exclude admission and reference to anonymous letters regarding Res-Care**

Defendants did not oppose this motion in limine.  Therefore, the motion is granted as unopposed.

**12.     Plaintiff's Motion in limine to exclude admission of investigative reports compiled by the California Department of Justice ("DOJ")**

As stated at the November 10, 2010 pretrial conference, the motion to exclude the DOJ investigation reports is denied.  However, the Court stated that irrelevant material from this and other similar investigation reports should be redacted and the Court will give a limiting instruction to the jury.  The parties were unable to agree on redactions for the investigative reports.  On January 13 and 18, 2011, the parties submitted their proposed redactions.  The Court's rulings on the proposed redactions are contained in a separate order.  Pursuant to the concurrent order regarding redactions, Plaintiffs' motion in limine is granted in part and denied in part.

**13.     Plaintiff's Motion in limine to Alfredo Mercado's medical training and work as a doctor in Mexico**

At the time of the underlying incident, Mr. Mercado was involved in Ms. Rodriguez's care as

**United States District Court**
For the Northern District of California

1   a direct care services staff member at McGarvey House.  At Mr. Mercado's deposition, he referred to

2   his medical training in Mexico over twenty years ago.  Plaintiff seeks exclusion of all references to

3   Mr. Mercado's medical education and practice in Mexico as irrelevant.  Leonard Valve argues that

4   Mr. Mercado's medical background is relevant, especially since he checked on Ms. Rodriguez at

5   8:00 p.m. on the date of the incident and  noted her "weird" behavior, but did not act or call 911.

6          Evidence of Mr. Mercado's medical background is unfairly prejudicial, may confuse the jury,

7   and waste time since the jury may expect that Mr. Mercado's training is relevant in evaluating his

8   conduct, especially because a lack of appropriate medical staff is not an issue in the case.  It is

9   excluded pursuant to Federal Rule of Evidence 403.  Although Mr. Mercado may testify as a

10  percipient witness to the aftermath of the scalding incident, Leonard Valve is precluded from asking

11  him to testify about his prior medical training unless, of course, Mr. Mercado opens the door to such

12  testimony on direct examination.  Thus, Plaintiff's motion in limine is granted.

13  **14.    Plaintiff's Motion in limine to exclude police interrogation video and points and
        authorities in support thereof**

14
15         On or about May 21, 2004, the Redwood City Police Department interrogated Ms. Ocansey

16  regarding the underlying scalding incident.  Plaintiff seeks to exclude the interrogation video and all

17  references to it on the ground that it is irrelevant.  Plaintiff states that it does not dispute that Ms.

18  Ocansey showered Ms. Rodriguez on the date of the incident.

19         Leonard Valve argues that most, if not all, of the interrogation video is relevant to many

20  issues in this case other than whether Ms. Ocansey showered Ms. Rodriguez on that day, including,

21  among other things, the use of the same shower right after Ms. Rodriguez's shower and Ms.

22  Ocansey's description of showering procedures and exactly how she turned the water on and

23  checked the shower's temperature.

24         As discussed at the pretrial conference, the only proper purpose for admission of the

25  interrogation video would be impeachment by prior inconsistent statement under Federal Rule of

26  Evidence 613.  Prior inconsistent statements are relevant to the jury's evaluation of Ms. Ocansey's

27  character for honesty, and to allocating fault.  The Court cautions Leonard Valve against playing the

28  entire two hour video, and encourages Leonard Valve to offer into evidence only those portions of

    the video sufficient to establish a prior inconsistent statement, if there is one.  Thus, Plaintiff's

1    motion in limine is denied.

2    **15.    Plaintiff's Motion in limine to exclude reference to any criminal prosecution or conviction of Oretha Ocansey**

3

4          Based on the underlying scalding incident, Ms. Ocansey was charged with violating

5    California Penal Code § 368(b)(1), involving crimes against dependent adults, and she pled nolo

6    contendere.  Plaintiff seeks exclusion of any reference relating to any criminal prosecution of

7    Ocansey, her nolo contendere plea, or her subsequently expunged conviction.

8          A plea of nolo contendere cannot be used against a defendant as an admission of guilt in a

9    later civil suit.  Fed. R. Evid. 410 ("Except as otherwise provided in this rule, evidence of the

10   following is not, in any civil or criminal proceeding, admissible against the defendant who made the

11   plea or was a participant in the plea discussions: (1) a plea of guilty which was later withdrawn; (2)

12   a plea of nolo contendere . . . .").  However, Federal Rule of Evidence 609, by its plain language,

13   permits evidence of convictions for impeachment purposes.  See Fed. R. Evid. 609 ("(a) General

14   rule.--For the purpose of attacking the character for truthfulness of a witness, (1) evidence that a

15   witness other than an accused has been convicted of a crime shall be admitted, subject to Rule 403,

16   if the crime was punishable by death or imprisonment in excess of one year under the law under

17   which the witness was convicted, and evidence that an accused has been convicted of such a crime

18   shall be admitted if the court determines that the probative value of admitting this evidence

19   outweighs its prejudicial effect to the accused; and (2) evidence that any witness has been convicted

20   of a crime shall be admitted regardless of the punishment, if it readily can be determined that

21   establishing the elements of the crime required proof or admission of an act of dishonesty or false

22   statement by the witness."); Brewer v. City of Napa, 210 F.3d 1093, 1096 (9th Cir. 2000) ("The

23   issue presented in this appeal is whether evidence of a conviction based on a no contest plea can be

24   admitted for impeachment purposes under Rule 609. We conclude that such evidence is admissible.

25   Rule 410 by its terms prohibits only evidence of pleas (including no contest pleas), insofar as pleas

26   constitute statements or admissions.").  Thus, Ms. Ocansey's nolo contendere plea cannot be

27   admitted as evidence of an admission of guilt, but her conviction can be admitted for impeachment

28   under Rule 609.

          Further, Ms. Ocansey's prosecution and conviction are irrelevant to a determination of

whether Plaintiff was an intentional tortfeasor because Penal Code section 368(b)(1) does not require intent to cause harm.  Therefore, the prosecution and conviction under this section do not establish, per se, an intentional tort, and cannot be used as evidence for that purpose.

Therefore, as stated at the November 10, 2010 hearing, Plaintiff's motion in limine is granted in part.  Evidence of Ms. Ocansey's plea, prosecution and conviction cannot be used as an admission against her or Plaintiff, but her conviction can be used against Ms. Ocansey for impeachment.

**16.     Plaintiff's Motion in limine to exclude certain hearsay statements by Norma Molina**

Ms. Molina was employed by Res-Care during the underlying incident and Defendants took her deposition.  Plaintiff seeks to exclude any testimony from Ms. Molina regarding:

> 1) Ms. Molina's understanding of the 911 policy as she believes it was explained to her by Mr. Porche.
> 2) Whether there was money to buy sufficient food at the McGarvey Home;
> 3) Whether Mr. Porche would cram residents in the company van and drive them around without seatbelts;
> 4) Whether Mr. Porche allegedly asked her to have sex with him;
> 5) Whether Mr. Porche discriminated against employees based on their race;
> 6) Whether Mr. Porche did not keep the McGarvey House clean;
> 7) Whether Mr. Porche threatened to turn her into INS if she did not go out with him;
> 8) Whether Mr. Porche threatened to fire her if she called Res-Care's corporate headquarters in Kentucky regarding the problems that Ms. Molina believed existed at McGarvey Home; and
> 9) Whether Mr. Porche did not adequately train employees but she could not identify which employees or when.

As described at the November 10, 2010 pretrial conference, testimony about whether there was money to buy sufficient food at the McGarvey Home, whether Mr. Porche would cram residents in the company van and drive them around without seatbelts, whether Mr. Porche asked Ms. Molina to have sex with him, whether Mr. Porche discriminated against employees based on their race, whether Mr. Porche failed to keep the McGarvey House clean, and whether Mr. Porche threatened to turn Ms. Molina over to Immigration and Customs Enforcement is irrelevant to the issues in this case, and even if it were, would be excluded under Federal Rule of Evidence 403.  By contrast, Ms. Molina's testimony regarding Mr. Porche's retaliatory threat to fire her and her allegations of inadequate training are relevant to the issues in this case.

Plaintiff argues that Ms. Molina's testimony regarding Plaintiff's 911 policy is hearsay because it involves out-of-court statements by Mr. Porche.  Further, Plaintiff argues that such a

statement, if made by Mr. Porche, was not a party admission since Plaintiff claims that was outside the scope of his employment to make such a statement.  However, Ms. Molina's testimony regarding the 911 policy constitutes a party admission and is therefore admissible.  Fed. R. Evid. 801(d)(2).  The plain language of the rule states that the statement must concern a matter within the scope of and during employment; there is no requirement that the declarant be acting within the scope of authority.  See Fed. R. Evid. 801(d)(2)(D).  The statements by Mr. Porche to Ms. Molina regarding the 911 policy constituted a matter within the scope of Mr. Porche's employment.  Thus, Plaintiff's motion in limine is granted in part.

**Leonard Valve's Motions in Limine**

**1.     Leonard Valve's Motion to exclude evidence of settlement offers**

Plaintiff did not oppose this motion in limine.  Therefore, Leonard Valve's motion is granted as unopposed.

**2.     Leonard Valve's Motion to exclude references to ASSE standards**

Leonard Valve moves to exclude all references to any advisory standards including the American Society of Sanitary Engineers (ASSE) standards 1016 and 1017, or any reference that Leonard Valve did not seek certification of its products under those standards.  Specifically, Leonard Valve argues that the ASSE standards do not impose a duty on Leonard Valve as the manufacturer.  Plaintiff argues, however, that the ASSE standards are mandatory and therefore, Leonard Valve's failure to comply with them in connection with the Model 110 valve is negligence.  Plaintiff confirmed at the January 14, 2011 pretrial conference that the dispute in this motion had been narrowed to ASSE 1017 only.  As stated at the hearing and as described below, Leonard Valve's motion in limine is granted.

The Court need not reach the issue of whether the standards are mandatory.  First, there is no evidence that the 1991 Plumbing Code, the 1995 Plumbing Code, the ASSE standard 1017, the ASSE website materials and the 2010 Plumbing Code, which were offered as evidence in Plaintiff's supplemental brief on this motion and on which Plaintiff's opposition to this motion relies, were previously disclosed in this case.  See Fed. R. Civ. P. 26(a)(1)(A).  Plaintiff has not made any showing that the failure to disclose these documents was substantially justified or harmless.

13

**United States District Court**
For the Northern District of California

1   Therefore, these documents are stricken.

2          Further, many of the opinions set out by Plaintiff in their supplemental brief were not

3   previously disclosed and are opinions by counsel rather than by an expert.  The only expert to

4   reference ASSE standard in his report or deposition was Plaintiff's expert, Ronald George, who

5   briefly stated in his report that the Model 110 was not listed, labeled or certified by a third party

6   agency, and who testified at his deposition that the Model 110 valve could be used in applications

7   other than a residential plumbing system and that he based his opinions on the 2000 Plumbing Code.

8   Leonard Valve's Supp. Brief Ex. C at 75-76.  Mr. George admitted at his deposition that he did not

9   think Leonard Valve violated any standard or code or regulation simply by manufacturing the Model

10  110 because there are some applications where it can be used and not be in a plumbing system.  Id.

11  Ex. D at 97-98.  Plaintiff's expert, Mr. Wolf, did not mention the standards in his report, and at his

12  deposition, he testified that he had heard of the ASSE standards, but that he had not analyzed them,

13  nor did he know whether the Model 110 met those standards.  Id. Ex. E at 44.

14         Leonard Valve argues that based on the lack of opinions that it violated the ASSE standards

15  in the reports and testimony from Mr. George and Mr. Wolf, and Plaintiff's failure to disclose the

16  documents described above, Leonard Valve was led to believe that Plaintiff had abandoned its

17  argument based on the standards.  This was a reasonable assumption, and Plaintiff has made no

18  showing to the contrary.

19         Leonard Valve also argues that ASSE compliance is not causally related to the underlying

20  incident involving Rodriguez.  Specifically, Leonard Valve points to Mr. George's testimony that

21  there was an ASSE approved, anti-scald device present on the showerhead at the time of the

22  incident, which was downstream from the Leonard Valve Model 110 valve.  Leonard Valve's Supp.

23  Brief Ex. M at 17-18, 88-95.  He explained that the ASSE approved anti-scald device would have a

24  maximum temperature limit stop on it so that the valve would stop at a designated point so that the

25  temperature exiting the showerhead would be at a certain temperature.  Id. at 88-95.  Plaintiff's

26  expert Mr. Wolf also testified that he believed there was an ASSE-approved, pressure-balancing

27  valve at the showerhead itself.  Id. Ex. N at 37-45.  Mr. Wolf described it as a Delta fixture, and

28  testified that he had no reason to believe that the device did not meet the ASSE standards.  Id. at 42-

44.  He agreed that the device could have been used to provide anti-scald protection and explained that the Delta fixture would have been the final stop for water delivered to the residential shower. Id.  Thus, Plaintiff's experts have in effect acknowledged that a valve that complied with the ASSE standards did not prevent the scalding.

In arguing that the ASSE standards are mandatory, Plaintiff notes that the relevant Plumbing Codes provided the minimum standards for plumbing design, construction, installation, quality of materials and operation of plumbing systems for the protection of public health, safety and welfare, as well as the minimum standards for fixtures and devices, including mixing valves, used in plumbing systems.  Webster Decl. Ex. A at § 201(a); Table A; Ex. B at § 101.2; § 301.1.1; Table 14-1.  Specifically, § 201(a) of the 1991 Code states: "All pipe, pipe fittings, traps, fixtures, material and devices used in a plumbing system shall be listed or labeled by a listing agency or shall be approved by the Administrative Authority when listing or labeling by a listing agency is not available."  Webster Decl. Ex. A at § 201(a).  Next, Plaintiff argues that ASSE is a listing agency. Webster Decl. Ex. E.  Finally, Plaintiff points to the Tables entitled "Plumbing Material Standards" set out the approved listing agency and standard for "Temperature actuated mixing valves for primary domestic use," listing ASSE 1017.

However, Leonard Valve has presented evidence that the valve at issue was not a mixing valve within the meaning of ASSE 1017, and was instead a tempering valve.  See, e.g., Leonard Valve's Supp. Brief Ex. F at 88, 94-95.  Leonard Valve's president Wilcox testified that mixing valve is a broad term that includes many valves such as the Model 110 valve, which he called a tempering valve.  Id. at 117-18.  Mr. Wilcox testified that ASSE 1017 was created in 2005 to apply to temperature-actuated mixing valves for domestic hot water systems.  Id. Ex. G at 152.  Model 110 was not a point of use valve, and its warnings stated that it was not designed for direct showering or bathing applications, meaning that the water should not leave the Model 110 and go directly into a shower or bathtub.  Id. Ex. F at 83, 92; Ex. J at 187; Ex. K at 197.  Model 110 was not considered an anti-scald device, which would be a showering valve that would shut down upon the loss of cold water, and the Model 110 was not designed to respond to large changes in pressure like an anti-scald device.  Id. Ex. F at 94-95.  Model 110 was not designed or used for the ASSE standards because it

15

did not have sufficient control similar to a thermostatic mixing valve.  Id. Ex. H at 137.

Plaintiff, on the other hand, points to excerpts from Leonard Valve's catalogs, which describe the Model 110 as "designed to mix high temperature hot water at the heater outlet, with cold water," and as "automatically mixes the hot water supply . . . with cold water to deliver tempered water to fixtures."  Supp Webster Decl. Ex. F at LV000001 and LV000004.  This catalog description is not inconsistent with Mr. Wilcox's testimony that the Model 110 was not to be used at the showerhead because the description states that the valve is to be used at the heater outlet. Further, the use of the term "mix" does not necessarily mean that the valve is a mixing valve as that term is used in the standards or the Code.  Plaintiff has not made a showing that ASSE standard 1017 applies to the Model 110.

**3.**       **Leonard Valve's Motion to exclude evidence of other lawsuits involving Leonard Valve**

Plaintiff did not oppose this motion in limine.  Therefore, Leonard Valve's motion is granted as unopposed.  Evidence of other lawsuits against any of the parties in this case is excluded.

**4.**       **Leonard Valve's Motion to exclude opinions of Ronald George**

Plaintiff's expert, Ronald George, is a certified plumbing system designer and professional engineer who has opined that Leonard Valve's Model 110 valve was not adequately designed because it was subject to rust, corrosion, calcification and therefore failure, and that a safer, more reliable alternative liquid-filled valve design was available at the time the bi-metallic coil was installed at the McGarvey House.  Leonard Valve argues that Mr. George's opinions should be excluded pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 579-80 (1993).  As described below, Leonard Valve's motion is denied.

Leonard Valve argues that Mr. Wolf's testimony regarding the adequacy of Leonard Valve's warning labels is not reliable.  See Salinas v. Amteck of Kentucky, 682 F. Supp. 2d 1022 (N.D. Cal. 2010) (excluding expert opinion as unreliable).  Specifically, for example, Leonard Valve argues that Mr. George testified that he had not inspected the McGarvey House, and only made a visual inspection of the valve.  See Pender Decl. Ex. B at 81.  Mr. George testified that he could not think of any publications that were critical of the bi-metallic design, only that he has been to certain seminars where the mixing valve technologies have been discussed.  Pender Decl. Ex. B at 82.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

However, Mr. George has also observed at least five valve manufacturers' testing laboratories and witnessed comparative tests of the different valve technologies. Id. at 84. In addition, he has extensive experience designing plumbing systems for all building types and has experience evaluating and developing code language for plumbing and mechanical systems, including domestic hot water systems. Id. He has served on numerous ASSE plumbing product standard working groups. Id. at 2. He has served on the ASSE Seal Control Board, which reviews plumbing products seeking the ASSE Seal. Id. He has published hundreds of articles for Plumbing Engineer Magazine. Id. He has given many presentations related to plumbing systems, codes, product standards, fixtures, equipment and devices. Id. He has also given presentations on domestic hot water system designs, including the dangers of scalding and methods for guarding against hot water scald injuries. Id. Leonard Valve argues that George has not demonstrated by valid scientific method that liquid-filled valves seize less than bi-metallic ones, but instead relied generally on seminars and laboratory tours to support his opinions. However, Mr. George's experience in the field, coupled with his personal observation of laboratory testing, makes his opinion reliable.

Leonard Valve further argues that Mr. George's opinion that there exists a second, lawful design for tempering valves -- liquid-filled -- is not relevant to the issue of whether there was a design defect in the Model 110 at issue in this case. There are two tests for determining design defect:

> First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design.

Barker v. Lull Engineering, 20 Cal.3d 413, 432 (1978). The Court previously granted Leonard Valve's motion for summary judgment as to Plaintiff's design defect claim under the consumer expectations test. Therefore, any opinions going to the consumer expectations test are excluded. However, to the extent that Mr. George's opinions relate to the existence of an alternative valve design, they are relevant to determining whether the design of the valve was a proximate cause of Rodriguez's injuries and whether the benefits of the design outweighed the danger under the second

1  test for a design defect.  Further, Mr. George's opinions as to whether the valve failed due to rust or

2  corrosion, whether it was compliant with industry standards, and whether alternative designs

3  existed, are relevant to the issue of negligent design.  See Pike v. Frank G. Hough Co., 2 Cal.3d 465,

4  470 (1970) ("Thus, the manufacturer must use reasonable care 'to so design his product as to make it

5  not accident-proof, but safe for the use for which it was (sic) intended.'  What is 'reasonable care,'

6  of course, varies with the facts of each case, but it involves a balancing of the likelihood of harm to

7  be expected from a machine with a given design and the gravity of harm if it happens against the

8  burden of the precaution which would be effective to avoid the harm.") (internal citation omitted).

9  **5.      Leonard Valve's Motion to exclude opinions of Adolf Wolf**

10         Plaintiff's expert, Adolf Wolf, is an engineer who has opined that Leonard Valve did not

11  affix adequate warnings to the mixing valve that was installed at the McGarvey House or conduct

12  adequate product testing on the mixing valve.  Leonard Valve argues that Mr. Wolf's opinions

13  should be excluded pursuant to Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 579-80 (1993).

14  As described below, Leonard Valve's motion is denied.

15         Leonard Valve argues that Mr. Wolf's testimony regarding the adequacy of Leonard Valve's

16  warning labels is not reliable.  See Salinas v. Amteck of Kentucky, 682 F. Supp. 2d 1022 (N.D. Cal.

17  2010) (excluding expert opinion as unreliable).  Specifically, Leonard Valve argues that Mr. Wolf

18  did not know who installed the valve at the McGarvey House (Pender Decl. Ex. A at 110; Ex. B at

19  26), did not read anything in the record that would suggest the mindset of the installer (Id. Ex. A at

20  110), did not have any evidence that anyone was misled by the warning (Id. Ex. B at 46), and did not

21  review the maintenance guide and record in this case (Id. Ex. A at 150).

22         However, in reaching his opinions, Mr. Wolf reviewed photographs of the warning labels as

23  well as pertinent depositions and applicable plumbing standards (Pender Decl. Ex. C at 2), and relied

24  on his extensive experience in and knowledge of the plumbing industry and warning labels used

25  therein.  Further, Mr. Wolf has some experience with warning labels.  Webster Decl. Ex. A at 19-20.

26  He is a professional engineer, which provides him with the expertise to approve mechanical plans

27  for a plumbing or hot water system design.  Webster Decl. Ex. A at 11-12.  He developed testing

28  protocols for products that employ temperature mixing valves.  Id. at 20.  He works as an

United States District Court
For the Northern District of California

1  engineering consultant involving equipment failures as least some of which relate directly to water

2  heaters.  Id. at 48.  He has provided testimony in several other scalding cases.  Id. at 8.  On balance,

3  Mr. Wolf's testimony is reliable.

4        Leonard Valve also argues that Mr. Wolf's testimony is irrelevant to the question at issue in

5  this case, which is whether the defective product was a substantial factor in bringing about the

6  injury.  For example, Leonard Valve argues that Mr. Wolf simply opines that Leonard Valve should

7  have done testing on its valve, but then failed to do any testing of his own.  Pender Decl. Ex. B at

8  23-24.  His testimony, however, is relevant to the issues in this case, namely whether the warnings

9  were sufficient, and whether there was inadequate product testing which goes to whether the product

10  was defectively designed or manufactured or whether Leonard Valve was negligent.  On balance,

11  Mr. Wolf's testimony is sufficiently reliable and relevant.

12  **Roto-Rooter's Motions in Limine**

13  **1.    Roto-Rooter's Motion to preclude reference to insurance**

14        Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.

15  References to insurance held by any party are excluded.

16  **2.    Roto-Rooter's Motion to preclude reference to statements made during settlement
negotiations**

17

18        Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.

19  References to statements made by any party during settlement negotiations are excluded.

20  **3.    Roto-Rooter's Motion to preclude reference to financial condition of Roto-Rooter**

21        Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.

22  References to the financial condition of any party is excluded.

23  **4.    Roto-Rooter's Motion to preclude documents or witnesses not previously produced or
identified**

24        Roto-Rooter specifically seeks to exclude any evidence or reference to claims that Plaintiff

25  contacted Roto-Rooter after installation of the water heater, but before the scalding incident.

26  Although Roto-Rooter argues that there has been no evidence on this point, in opposition to

27  summary judgment in this case, Plaintiff submitted a declaration from Faye Richins, Plaintiff's

28  Executive Director, from the underlying state court case stating that the House Manager Frederick

**United States District Court**
For the Northern District of California

1   Porche told her that he contacted Roto-Rooter several times after the installation but before the

2   scalding incident about the fluctuating water temperatures.  At the January 28, 2011 pretrial

3   conference, the parties confirmed that they had previously agreed that all evidence from the state

4   court case would be part of discovery in this case.  Thus, Roto-Rooter's motion in limine is denied.

5   **5.      Roto-Rooter's Motion to exclude testimony of expert John Giacoma**

6          John Giacoma is Plaintiff's expert witness in plumbing repair, who will offer his opinions

7   that Roto-Rooter's technician Keith Campbell did not meet the plumbing standard of care when he

8   replaced and serviced the water heater at the McGarvey House.  Mr. Giacoma has also opined that

9   Roto-Rooter did not meet the standard of care by not obtaining a permit for the water heater

10  installation.

11         Roto-Rooter argues that Mr. Giacoma is unqualified to testify about the plumbing standard

12  of care relating to the installation of the water heater in this case.  Specifically, Roto-Rooter notes

13  that Mr. Giacoma has not held a plumbing license since 2000 (MIL 5 Ex. J at 23-24) and has never

14  personally installed a water heater (although he has overseen installations of water heaters over fifty

15  gallons at large convalescent facilities) (MIL 5 Ex. C at 22; Ex. D at 22; Ex. H at 27).  Roto-Rooter

16  further states that Mr. Giacoma's experience with plumbing systems is primarily managerial and not

17  focused on single family homes, instead focusing on schools (MIL 5 Ex. B at 21).

18         However, Mr. Giacoma began his career as a plumbing apprentice when he worked as a

19  plumber/fitter/master plumber for ten years.  Webster Decl. Ex. J (resume).  He then worked for

20  Linford Air & Refrigeration where he estimated, managed and supervised installations for plumbing,

21  heating, boilers, HVAC and refrigeration.  Id.  He then worked as a project manager with

22  responsibilities for, among other things, plumbing construct projects and estimating and procuring

23  plumbing equipment.  Id.  Then he worked as a contractor in, among other things, plumbing in

24  schools and commercial facilities.  Id.  For the past about eighteen years, he has worked as a

25  consultant on plumbing, heating, HVAC and piping systems.  Id.  During his career, he has installed,

26  repaired, remodeled, managed, supervised, and consulted on the installation of domestic hot water

27  systems.  Webster Decl. Ex. K at ¶ 1.  He has an thorough understanding of how water heater

28  systems can and should be configured to safely meet the needs of various types of clients.  Id.

United States District Court
For the Northern District of California

1   Further, Mr. Giacoma is certified in plumbing engineering and design.  Webster Decl. Ex. J.  The

2   fact that Mr. Giacoma is not a plumbing repair technician and has not personally replaced a water

3   heater does not make him unqualified, particularly in light of his extensive experience in plumbing.

4        Roto-Rooter also argues that Mr. Giacoma is not qualified to testify about permitting

5   practices.  Roto-Rooter notes that Mr. Giacoma did not personally obtain any permits for plumbing

6   work (Roto-Rooter's Mot. in Limine #5 Ex. E at 24; Ex. F at 25; Ex. H at 27), and was not present at

7   any inspections related to the permits (Roto-Rooter's Mot. in Limine #5 Ex. G at 26).  Thus,

8   according to Roto-Rooter, Mr. Giacoma's opinion that an inspector would have "verified delivered

9   temperature to the fixtures based on disabled requirement," is unsupported by any expertise.  Roto-

10  Rooter's Mot. in Limine #5 Ex. A at 2.  However, at the hearing, Plaintiff provided evidence that

11  Mr. Giacoma is qualified to testify about the permitting process.  Specifically, in his 2007 deposition

12  in the underlying state court case, Mr. Giacoma testified that had Roto-Rooter obtained a permit for

13  the water heater installation:

14       An inspector would have gone on the project; would have noted that there was a
         convalescent-type facility where there was somebody handicapped or something due
15       to ramps that are in the building, and probably would have more than likely checked
         the temperature on the shower.  I mean that would be pretty standard practice if you
16       were an inspector in any handicap-type facility.

17  2007 Giacoma Depo. at 40.  Thus, it was Mr. Giacoma's opinion that, assuming that the inspection

18  would have occurred before the scalding incident, the absence of a permit for the water heater

19  installation caused Ms. Rodriguez's injury.  Thus, Roto-Rooter's motion in limine is denied.

20  **6.      Roto-Rooter's Motion to exclude testimony of expert Ronald George**

21       Roto-Rooter seeks to exclude Mr. George's opinions regarding a plumbing repair

22  technician's standard of care as it relates to Keith Campbell and whether Mr. Campbell's conduct in

23  replacing a water heater at the McGarvey House violated the Redwood City Building Code.  Roto-

24  Rooter argues that Mr. George lacks the qualifications for these opinions.

25       Roto-Rooter argues that Mr. George lacks the requisite experience as a plumbing repair

26  technician, and lacks the requisite experience as it relates to water heater installations to testify as an

27  expert in those areas because he is only installed three water heaters, all at his own residences in

28  Texas and Michigan.  Therefore, Roto-Rooter argues that Mr. George is not qualified to opine as to

1   Mr. Campbell's standard of care.  However, Mr. George has decades of experience in designing and

2   assessing water heater systems in commercial settings, including hospitals, medical clinics, prisons,

3   universities, stadiums and hotels, and in installing and overseeing the installation of hot water

4   systems.  Further, Mr. George provides consulting and forensic investigative services for plumbing

5   and mechanical system failures, including scalding incidents.  Webster Decl. Ex. N.  In addition, Mr.

6   George has written several articles in the field.  Webster Decl. Ex. N.  He has also  given

7   presentations pertaining to hot water scalding hazards.  Id. at Ex. Y.  He is qualified to provide

8   opinions as to the standard of care for water heater installation.

9          Roto-Rooter also argues that because Mr. George has no experience in the permitting system

10   as it pertains to water heaters and because his only knowledge about it comes from a hearsay

11   conversation he had with another person (Roto-Rooter's Mot. in Limine #6 at Ex. E at 10-11), he is

12   not qualified to provide opinions on the building code permitting process in Redwood City.

13   However, Mr. George has knowledge of water heater systems and understands the importance of

14   complying with applicable codes, even though his experience is in other states.  Webster Decl. Ex. O

15   at 9-10.  Roto-Rooter has not provided any evidence that the Plumbing Codes in Texas and

16   Michigan are substantially different than in California.  Further, Mr. George has experience as an

17   active member of local, national and international plumbing associations, including the International

18   Code Council (ICC) and the ASSE.  Webster Decl. Ex. N.  He served on code writing committees,

19   including the ICC, the ASSE and the International Residential Plumbing and Mechanical Code

20   Committees, and has participated in the development and drafting of hot water temperature control

21   standards.  Id.  He regularly attends the model code hearing for the International Codes and Uniform

22   Codes.  Id.  Thus, Mr. George is qualified to opine on permitting matters.

23          Thus, Roto-Rooter's motion in limine is denied.

24   **7.     Roto-Rooter's Motion to exclude testimony of expert Adolf Wolf**

25          Roto-Rooter seeks to exclude Mr. Wolf's opinions regarding a plumbing repair technician's

26   standard of care as it relates to Roto-Rooter 's employee, Keith Campbell, who replaced the water

27   heater, arguing that Mr. Wolf lacks the qualifications to opine on that issue.  Mr. Wolf opined that

28   Mr. Campbell was not properly trained, that Roto-Rooter failed to obtain a permit for the installation

1  of the water heater, and that Mr. Campbell "did a totally incomplete installation."  Roto-Rooter's

2  Mot. in Limine #7 Ex. A at 6-7.

3  Mr. Wolf, however, has extensive qualifications in the plumbing and engineering field.  He

4  testified that when he was a student, he worked as a mechanical estimator for a plumbing company

5  and worked on one plumbing/hot water system that carried steam.  Roto-Rooter's Mot. in Limine #7

6  Ex. B at 10.  He testified that he performed plumbing repairs at his own home, and that when he was

7  a student, he oversaw plumbing installations.  Id. Ex. C at 49.  He has worked as a consultant on

8  equipment failure cases, several of which related to water heaters.  Id. Ex. D at 48.  Further, Mr.

9  Wolf has worked on five or six scalding cases.  Mr. Wolf is qualified to render opinions on the

10 standard of care for a plumbing repair technician.  Roto-Rooter's motion in limine is denied.

11 **8.      Roto-Rooter's Motion to exclude testimony of expert Sridhar Natarajan**

12 Dr. Natarajan is a medical doctor who is board certified in forensic pathology, anatomic

13 pathology and clinical pathology, and subspecialty certified in medical microbiology.  Roto-Rooter's

14 Mot. in Limine #8 Ex. B.  He opined in this case that Ms. Rodriguez's burns can be explained by an

15 intermittent elevation in water temperatures, not by an immersion type event, and that her exposure

16 to hot water of an elevated temperature took place over a relatively short period of time and that Ms.

17 Rodriguez sustained her primary injuries during this intermittent exposure.  Id. Ex. A at 6-7.  Roto-

18 Rooter argues that Dr. Natarajan is not qualified in the area in which he opines.  Plaintiff has

19 confirmed that it intends to offer Dr. Natarajan as an expert on burn causation, not burn treatment.

20 Dr. Natarajan is an expert in burn injury causation.  Id. Ex. C at 19; Webster Decl. Ex. W at

21 69.  He testified that he has extensive experience in the analysis of burns, when they are initiated,

22 and the patterns that may arise from them, and the mechanisms by which they could occur.  Webster

23 Decl. Ex. W at 69.   He obtained his experience from his training in forensic pathology where burn

24 injury causation is a common occurrence, from his practice in determining the extent of burn, from

25 2,000 to 3,000 autopsies within which burns are common, from reviewing over 4,000 autopsy

26 reports as a senior reviewer, from being on the Burn and Trauma Morbidity and Mortality Team at

27 the University Medical Center, and from working with the Institute of Surgical Research evaluating

28 burns.  Id. at 70-71.  Further, Dr. Natarajan's opinions were based on color photographs of Ms.

Rodriguez's burns, her medical records, photographs of the incident site, investigative reports, water temperature logs, depositions taken in this action, and Defendants' expert reports.  Webster Decl. Ex. X.  Thus, Dr. Natarajan is qualified to opine regarding burn causation.  Roto-Rooter's motion in limine is denied.

**9.      Roto-Rooter's Motion to exclude reference to attorneys' fees and/or costs of suit**

Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.  References to evidence of costs and attorney's fees incurred by any party are excluded.

**10.     Roto-Rooter's Motion to limit expert testimony to opinions in expert report and in deposition**

Plaintiff did not oppose this motion insofar as the motion does not preclude experts from offering testimony at trial regarding testimony or opinions of other experts in this action.  Thus, with that qualification, this motion is granted as unopposed.  The parties shall  meet and confer as to which evidence falls within this scope before raising any objections on this basis.

**11.     Roto-Rooter's Motion to preclude reference to or questions regarding non-felony background**

Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.  References to or questions regarding the non-felony background of any witness are excluded.

**12.     Roto-Rooter's Motion to exclude evidence of subsequent remedial measures as proof of negligence**

Through this motion, Roto-Rooter seeks to exclude any evidence concerning the subsequent replacement of the mixing valve at the McGarvey House for purposes of proving "negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction."  Fed. R. Evid. 407.  Plaintiffs oppose this motion, arguing primarily that the replacement of the valve was not a subsequent remedial measure within the meaning of Federal Rule of Evidence 407.  Specifically, Plaintiffs argued at the second pretrial conference that the actual replacement of the valve was a continuation of the water heater installation, which occurred prior to the scalding incident, rather than a subsequent remedial measure.

Evidence of the actual replacement of the valve is a subsequent remedial measure that is excluded under Rule 407 to the extent that the evidence is offered to show "negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction."

United States District Court
For the Northern District of California

Replacement of the valve was a "measure" which, if taken prior to the scalding incident, would have reduced the likelihood of the incident. However, events leading up to the replacement, such as service calls by Roto-Rooter to McGarvey Home after the scalding incident but before the valve replacement are not excluded as subsequent remedial measures. See Fasanaro v. Mooney Aircraft Corp., 687 F. Supp. 482, 486-87 (N.D. Cal. 1988) ("By its terms Rule 407 includes only the actual remedial measures themselves and not the initial steps toward ascertaining whether any remedial measures are called for."); see also Joseph McLaughlin, Weinstein's Federal Evidence, §§ 407.02[3]; 407.06[1]. Thus, Roto-Rooter's motion is granted in part and denied in part.

**13.    Roto-Rooter's Motion to exclude references to alleged code violations as evidence of negligence**

Although Roto-Rooter provides no legal authority for this motion, it appears that Roto-Rooter may be relying on California Evidence Code section 669(a) to argue that Plaintiff should not be permitted to introduce evidence of alleged violations of the Uniform Building Code and Uniform Plumbing Code as negligence per se. See Cal. Evid. Code § 669(a) ("(a) The failure of a person to exercise due care is presumed if: (1) He violated a statute, ordinance, or regulation of a public entity; (2) The violation proximately caused death or injury to person or property; (3) The death or injury resulted from an occurrence of the nature which the statute, ordinance, or regulation was designed to prevent; and (4) The person suffering the death or the injury to his person or property was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted."). Resolution of this motion turns on the purpose of the building and plumbing code. At the pretrial conference, Plaintiff pointed to several general statements in the building and plumbing codes regarding the role of the codes in safeguarding public health, safety and welfare, but failed to make a showing that a purpose of the codes was to prevent scalding, rather than to ensure that the water heater is properly connected, strapped and vented to reduce the risk of fire, explosion or electrocution. Accordingly, Roto-Rooter's motion in limine is granted.

**14.    Roto-Rooter's Motion to exclude evidence of or reference to other lawsuits involving Roto-Rooter**

Plaintiff did not oppose this motion. Therefore, the motion is granted as unopposed. Evidence of or reference to other lawsuits involving any party is excluded.

1   //

2   **15.     Roto-Rooter's Motion to exclude non-party witnesses from the courtroom prior to
testifying**

3

4   Plaintiff did not oppose this motion.  Therefore, the motion is granted as unopposed.

5   **IT IS SO ORDERED.**

Dated: March 1, 2011

6

7   ELIZABETH D. LAPORTE
United States Magistrate Judge