1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

RES-CARE INC.,                              No. C-09-03856 EDL

       Plaintiff,                    **FINDINGS OF FACT AND**
                        **CONCLUSIONS OF LAW FOLLOWING**
  v.                                    **COURT TRIAL**

ROTO-ROOTER SERVICES COMPANY,

       Defendant.

_____/

      Plaintiff Res-Care, Inc. brought this action for indemnity against Defendants Roto-Rooter, Leonard Valve and Bradford White arising from Plaintiff's $8.5 million settlement of a lawsuit brought by the Conservator of a severely developmentally disabled adult, Theresa Rodriguez, who was severely scalded by hot water during a shower at McGarvey Home, a residential care facility, on May 5, 2004.  Prior to trial, Plaintiff settled this action with Leonard Valve and Bradford White. The case proceeded to trial against Roto-Rooter.   This matter was tried to the Court from May 9, 2011 through May 16, 2011.  James Napoli, Lori Ferguson and Warren Webster represented Plaintiff.  Kenneth Simoncini, Kerri Johnson and Angela Ompoc represented Defendants.  The parties consented to a court trial before a magistrate judge pursuant to 28 U.S.C. § 636(c).

      At trial, Plaintiff contended that Roto-Rooter and its employee breached the standard of care in connection with the installation of the water heater at McGarvey Home, and that without Roto-Rooter's negligence, Ms. Rodriguez would not have been scalded.  Thus, Plaintiff argued that it was entitled to indemnity from Roto-Rooter of at least fifty percent of the settlement amount, offset by the settlement amounts of Leonard Valve and Bradford White.  Roto-Rooter contended that it had no liability for Ms. Rodriguez's injuries and therefore should not bear any portion of the settlement.

1    As described in more detail below, the Court finds that the evidence demonstrates that Roto-

2    Rooter's employee, Keith Campbell's, installation of the water heater at the McGarvey Home on

3    April 28, 2004, shortly before the scalding incident, was not within the plumbing standard of care.

4    The Court credits the testimony that thereafter the temperature of the water coming out of the

5    shower in the McGarvey Home fluctuated and reached excessive levels, and Plaintiff's employees

6    did not adjust the temperature on the water heater *higher* after Roto-Rooter's installation.  Roto-

7    Rooter's expert's explanation for the fluctuating water temperature was not persuasive.

8    With respect to the scalding incident itself, although the Court does not find Oretha Ocansey

9    to be credible on a number of points, it does not believe that she intended to harm Ms. Rodriguez.

10   The Court found Plaintiff's expert, Sridhar Natarajan, to be generally persuasive and credible that

11   Ms. Rodriguez was scalded by an intermittent rise in water temperature during the showering

12   process.  The Court did not find Roto-Rooter's expert Michel Brones to be persuasive or credible on

13   the issues of burn causation.

14   Further, the Court finds that the settlement amount paid by Plaintiff was reasonable.

15   Although Roto-Rooter's negligence contributed to Ms. Rodriguez's injuries, the Court declines to

16   attribute fifty percent of the settlement amount to Roto-Rooter.  Instead, as described below in

17   detail, Plaintiff is entitled to indemnity from Roto-Rooter of fifteen percent of the settlement

18   agreement, offset by the settlements with Bradford White and Leonard Valve.

19   The Court makes the following findings of fact and conclusions of law.

20   **Findings of Fact**[1]

21   **1.    McGarvey Home**

22   In 2004, Plaintiff Res-Care California, Inc., dba RCCA Services, operated McGarvey Home,

23   a residential care facility for severely developmentally disabled individuals.  See Joint Undisputed

24   Fact #2.  Res-Care, Inc. is the parent company of Res-Care California, Inc., a wholly-owned

25   subsidiary of Res-Care, Inc.  See Joint Undisputed Fact #3.  The McGarvey Home was licensed by

26   the California Department of Health Services as an intermediate care facility for the

27

28         [1]      The Court notes that its conclusions of law may contain findings of fact and its findings
of fact may contain conclusions of law.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    developmentally disabled-habilitative (ICF/DDH).  <u>See</u> Joint Undisputed Fact #4.

2    As of May 2004, Theresa Rodriguez, who was 51 years old at the time of the incident and

3    had diagnoses of profound mental retardation, cerebral palsy, spastic quadriplegia, and simple partial

4    seizures, had been a resident at McGarvey Home since 2002.  <u>See</u> Joint Undisputed Fact #16.  Ms.

5    Rodriguez was dependent on the staff at McGarvey Home for her daily care, activities of daily

6    living, medical care, financial needs and other basic needs.  Trial Transcript ("Tr.") at 238-39.

7    The McGarvey Home employed direct care staff to handle the daily activities of their clients,

8    as well as a house manager, Frederick Porche, who was responsible for ensuring that the house

9    operations were maintained.  Tr. at 244-45; 318-19.  Mr. Porche was permitted to contract with

10    outside vendors to maintain the home.  Tr. at 319.  He was also charged with ensuring that all of

11    Plaintiff's policies with respect to the care of the residents were followed.  Tr. at 244-45.

12    Plaintiff had a showering policy that required the direct care staff to constantly check the

13    temperature of the water while showering residents.  Tr. at 322-23; 337-38.  Specifically, the staff

14    was instructed to let the shower run several minutes before showering a client, and to continue to

15    monitor the water temperature throughout the shower.  Tr. at 528-29; 559-60.  Further, the

16    California Department of Health and Safety requires that if temperatures are out of an acceptable

17    range, for example, higher than 110°F, Plaintiff must suspend showers until the problem is

18    remedied.  Tr. 556; Def.'s Ex. B, C, J.  Plaintiff also had a policy concerning the provision of

19    medical care to residents that required, among other things, that direct care staff call 911

20    immediately if a resident sustained in injury or illness.  Tr. at 252-53.

21    **2.    Installation of the water heater at McGarvey Home**

22    On April 28, 2004, a McGarvey Home employee called Roto-Rooter about a leaking water

23    heater.  <u>See</u> Joint Undisputed Fact #1.  Keith Campbell, a Roto-Rooter technician with thirteen years

24    of experience, was dispatched from Roto-Rooter's Burlingame location to the McGarvey Home on

25    April 28, 2004 to respond to the complaint of a leaking water heater.  <u>See</u> Joint Undisputed Fact #5;

26    Tr. at 6. Mr. Campbell determined that the leaking water heater needed to be replaced and called the

27    Roto-Rooter Burlingame office for a new Bradford-White Defender Safety System 50-Gallon water

28    heater, which was a similar make and model to the water heater being replaced.  <u>See</u> Joint

3

**United States District Court**
For the Northern District of California

1   Undisputed Fact #6; Tr. at 11.  The subject Water Heater installed in the McGarvey Home was

2   designed, manufactured, and distributed by Bradford White.  See Joint Undisputed Fact #7.  Mr.

3   Campbell did not go inside the McGarvey Home at any time, and claims that he did not know that

4   McGarvey Home was a care home or ask any questions about whether any disabled individuals

5   resided at the home.  Tr. at 11-12.  He claims he did not notice the conspicuous wheelchair ramp in

6   the front of the home.  Tr. at 11-12; Ex. 21-3, 21-4, 21-5.  He was not told, and claims he did not

7   realize, that he would be servicing a commercial account, even though he wrote "RCCA Services"

8   as the customer name on the invoice he prepared.  Tr. at 11, 26-27; Ex. 227, 230.  He had never

9   installed a water heater at a care home, hospital or nursing home before April 28, 2004, nor had

10  Roto-Rooter provided any specific training regarding installation of water heaters in such places.

11  Tr. at  12.  During Ms. Campbell's approximately eight to twelve weeks of training with Roto-

12  Rooter, only about two hours of training per week focused on plumbing issues.  Tr. at 7.

13          Mr. Campbell had never received factory training from Bradford White or from any vendor

14  regarding water heater installation, nor did Roto-Rooter train him regarding the Bradford White

15  instruction manual.  Tr. at 9, 11; Swan Depo. 46-48.  Mr. Campbell did not read the Bradford White

16  instruction manual (Tr. at 16), so he was not aware of the instruction that to protect against hot water

17  scalding injuries, an approved mixing valve should be installed in the water system.  Ex. 29-019; Tr.

18  at 19-20.  There were also prominent warnings within the Bradford White manual and on stickers on

19  the tank itself advising of the scald risk, especially to children, the elderly and disabled individuals,

20  but Mr. Campbell also failed to see those warnings.  Tr. at 16; see also, e.g., Ex. 21-021, 21-26, 21-

21  34, 21-42.  Mr. Campbell had no training about the risks of scalding children and disabled and

22  elderly individuals.  Foley Depo. 97-98.

23          From 1995 until May 2004 after Mr. Campbell replaced the water heater, there was a

24  Leonard Valve mixing valve (Model 110) ("LV Mixing Valve 110") installed on the water line

25  between the water heater and the home.  See Joint Undisputed Fact #10, 11, 14.  The LV Mixing

26  Valve 110 was connected to the Water Heater by a short branch pipe line.  See Joint Undisputed

27  Fact #12.  The mixing valve had a large paper hanging tag, warning about the risk of scalding.  Ex.

28  22.  Mr. Campbell had to touch the valve to remove the leaking water heater, but he testified that he

4

United States District Court
For the Northern District of California

1  did not know what it was, what it did, or that it could affect water temperature. Ex. 22; Tr. at 17.

2  Mr. Campbell had not received any training in mixing valves from Roto-Rooter.  Tr. at 8, 20, 36;

3  Foley Depo. 76; Swan Depo. 59-61.  He did not check or adjust the valve, and he did not mention it

4  to anyone at McGarvey Home.  See Joint Undisputed Fact # 13; Tr. at 17.

5         Mr. Campbell set the temperature control knob of the water heater between "hot" and

6  "warm," which was his normal practice, but he did not know what temperature the water would

7  reach at that setting. Tr. at 14-15; Ex. 21-094, 29-19.  According to Roto-Rooter's expert, Mark

8  Hunter, a setting between "hot" and "warm" usually yields temperatures of around 125°F, which is

9  the standard in the industry.  Tr. at 367-68.  Plaintiff's expert, Adolf Wolf, testified that Mr.

10  Campbell set the temperature within the acceptable parameters recommended by the manufacturer,

11  but that he believed that the manufacturer's recommended range was too broad.   Tr. at 118.

12  However, that setting was above the red mark on the water heater itself.  Tr. at 14; Ex. 21-094, 29-

13  19.  Although Mr. Campbell ensured that the water heater "fired up" properly and was properly

14  strapped, he did not know what temperature would result from the thermostat setting and he did not

15  wait at McGarvey Home to test the temperature of the water coming from the faucets in the home

16  before he left.  Tr. 13-15; Joint Undisputed Fact #15.  Roto-Rooter did not train Mr. Campbell to

17  check the water temperature, which could take up to forty-five minutes, and as of the date of his

18  testimony, he had not done so as a regular practice.  Tr. at 14-15.

19         In accordance with Roto-Rooter's policy, Mr. Campbell did not obtain a permit for the water

20  heater replacement.  See Joint Undisputed Fact #9; Foley Depo. at 65, 68, 70; Rothman Depo. at 30.

21  Plaintiff's experts, Adolf Wolf and John Giacoma, testified that this practice foreclosed the

22  opportunity that the temperature fluctuations and corroded mixing valve would have been

23  discovered during a required inspection. Tr. at 115; 150, 151-52.  The Court, however, was not

24  persuaded by the testimony that it was more likely than not that an inspection would have made a

25  difference.  There was no evidence that an inspection would likely have occurred in the short time

26  between the installation and the accident, or that an inspection would have necessarily included

27  inquiry into the water temperature coming from the showerhead in the McGarvey Home.

28         The Court finds that there was no evidence that the physical installation of the water heater

5

itself was done improperly, and that the water temperature coming from the showerhead in McGarvey Home was at 110°F for three days thereafter. Pl.'s Ex. 19. However, Mr. Campbell did not meet the standard of care in the industry when he installed the water heater. The Court credits the testimony of Roto-Rooter's employee Rich Weider, who was dispatched to McGarvey Home after Mr. Campbell failed to diagnose the temperature fluctuation problem on two visits, as to the proper plumbing standard of care. Mr. Weider testified that his practice differed from Mr. Campbell's with respect to installation of water heaters. Mr. Weider testified that it was his practice to set the water heater temperature control knob to the red mark, which is the recommended setting, not higher as Mr. Campbell did. Tr. at 38. He stated that he recognized that McGarvey Home was a care facility when he first went to the house on May 12, 2004. Tr. at 42. He testified that he would expect to see a mixing valve in a care home, and that it was his practice to visually inspect a mixing valve when one was present. Tr. at 38, 42. He also testified that his practice was to go inside a home where he was working to obtain information the users of the home. Tr. at 42. He stated that he would leave the instruction manual with the customer and would advise the customer to keep the water temperature low if disabled individuals or children would be using the water. Tr. at 38-39. Mr Weider testified that part of the service that plumbers provide is to be familiar with the instruction manual for the products that are installed and with local codes and to follow them. Tr. at 40; see also Tr. at 149-50.

The Court is not persuaded by Roto-Rooter's plumbing expert, Mr. Hunter, who testified that any problems with the water heater would have manifested themselves immediately. Tr. 363-64. There is evidence of high temperature readings between April 28 and the date of the accident. Pl.'s Ex. 19. For example, on May 1, 2004 and again on May 4, 2004, the temperature log shows higher temperatures, and during the week following installation of the water heater, the water temperatures fluctuated by as many as twenty degrees. Id. Further, although Roto-Rooter's accident reconstruction expert, Steven Werner, relied on an analysis of the water heater in April 2007 to testify that the water heater did not produce fluctuating temperatures of a range of ten degrees, this testimony is not persuasive given the lapse of time between the accident and the analysis, and the actual temperature readings from the relevant time period. Tr. at 642-43. As noted by Dr. Werner,

United States District Court
For the Northern District of California

1   the highest temperature reading was logged on the same day that direct staff at McGarvey Home

2   adjusted the water heater temperature dial. Def.'s Ex. C, E.  However, the Court is persuaded that

3   staff adjusted the temperature downward, not upward (Porche Depo. 59-60), in an attempt to lower

4   the water temperature because it was too hot.

5   **2.      Fluctuating temperatures between April 28 and May 5, 2004**

6         The Court credits the testimony and evidence showing that the water temperatures fluctuated

7   in the time between the water heater installation on April 28, 2004 and the scalding accident on May

8   5, 2004, and thereafter through May 11, 2004, the last temperature reading before the mixing valve

9   was replaced.  The temperature log from McGarvey Home shows a temperature fluctuation of

10  twenty degrees from 135°F on May 1 to 115°F on May 2, 2004, and of ten degrees from 120°F on

11  May 4 to 130°F on May 5, 2004.  Pl.'s Ex. 19.  In the month prior to the water heater installation,

12  the temperature readings were fairly steady at 109° to 110°F, with one reading on April 26, 2004 of

13  115.5°F.  Id.  McGarvey Home staff tested water temperatures at regular intervals each day

14  following the scalding incident, and those temperature readings show that the water temperature

15  fluctuated throughout the day.  Ex. 94.

16        When Mr. Campbell returned to McGarvey Home on the day after the accident, he checked

17  the temperature of the water coming from the showerhead by turning on the water and putting his

18  hand under the water.  Tr. at 23.  He testified that he tested the water temperature with a

19  thermometer.  Tr. at 24, 28.  He testified that the water temperature and obtained a reading of "about

20  110."  Tr. at 24-25.  Thus, Mr. Campbell concluded that the water heater "tested fine."  Tr. at 26.

21  Accordingly, he did not adjust the temperature during that visit.  Tr. at 25; Ex. 231.  Later that

22  evening, however, the water temperature rose to 130°F.  Ex. 94.

23        Six days later, when Mr. Weider went to McGarvey Home to address the complaints of water

24  temperature fluctuation, he found that the temperature dial on the water heater was set below the

25  normal setting.  Tr. at 43.  But when he measured the temperature of the water, he observed

26  fluctuating temperatures from 110°F to 135°F.  Tr. at 44.  He contacted the water heater

27  manufacturer and learned that this fluctuation was normal for the water heater.  Tr. at 44.  Then Mr.

28  Weider inspected the mixing valve, and found that it was obviously corroded and replaced it.  Tr. at

**United States District Court**
For the Northern District of California

44-45; Ex. 229.  The water temperature stabilized thereafter.  Ex. 19.  The fact that showers were given safely at McGarvey Home both before and after the scalding incident provides further evidence that the water temperature was fluctuating during that time.  If Mr. Campbell had checked the water temperature after installing the water heater and had replaced the mixing valve, the water temperature at McGarvey Home would not have reached the high temperature that scalded Ms. Rodriguez.  Tr. at 16-18, 88, 126.

There is no admissible evidence about who, if anyone, instructed McGarvey Home staff to adjust the water heater temperature following the water heater installation.  Plaintiff relies on the testimony of Faye Richins, Plaintiff's former Executive Director, who testified that when Mr. Porche called Roto-Rooter to complain about fluctuating high temperatures, Roto-Rooter did not send a technician to McGarvey Home, but instead instructed Mr. Porche to turn the water heater down.  Tr. at 320-322, 334-35.  Ms. Richins' testimony, however, is inadmissible hearsay as to the truth of what Mr. Porche told her.  Mr. Porche testified in his deposition that he turned the water heater temperature knob down twice, but he did not testify as to who, if anyone, instructed him to do so.  Porche Depo. 59-60, 193.  Roto-Rooter argues in its closing brief that manual adjustments were made pursuant to Plaintiff's instruction, but the evidence cited by Roto-Rooter for this argument does not support a finding that Plaintiff instructed Porche or anyone else to adjust the temperature.  Tr. at 565-66; Porche Depo. 59-60; Pl.'s Ex. 218.

The Court is not persuaded by Roto-Rooter's theory that the fluctuating water temperatures at McGarvey Home were the result of staff members adjusting the temperature dial upward on the water heater.  There is no evidence that anyone at McGarvey Home turned the water heater temperature *up* at any time before or after the accident.  Roto-Rooter's expert, Mr. Werner, who is a specialist in vehicle accident reconstruction and does not have experience in plumbing issues, provided only speculative and unreliable testimony regarding Roto-Rooter's theory.  There is no evidence that anyone at McGarvey Home turned the temperature up after the water heater was installed, but before the accident.  To the contrary, the evidence is that Mr. Porche turned it *down* on two occasions.  Porche Depo. at 59-60.

**3.      The scalding accident**

8

United States District Court
For the Northern District of California

On the evening of May 5, 2004, at some time between 7:00 and 7:30 pm, Oretha Ocansey, a direct care staff member at McGarvey Home, gave Theresa Rodriguez a shower.  See Joint Undisputed Fact #17.  Ms. Rodriguez, suffered serious burn injuries to her abdomen, thighs, and perineal area as the result of being scalded while being showered.  See Joint Undisputed Fact #18. Ms. Ocansey testified that she felt the water in the shower each time she turned it on to shower Ms. Rodriguez to make sure that it was not too hot.  She described washing portions of Ms. Rodriguez's body and then rinsing each portion off separately with the water, each time checking the temperature with her own skin.  While the Court does not believe that Ms. Ocansey intended to harm Ms. Rodriguez, in general, the Court did not find Ms. Ocansey, whose testimony was received through her videotaped deposition, to be a credible witness as to what occurred on May 5, 2004, and believes that she did not in fact check the water temperature as frequently as she claimed.

Immediately following Ms. Rodriguez's shower, Ms. Ocansey did not tell anyone at McGarvey Home about that fact that Ms. Rodriguez was scalded.  Tr. at 531-32, 535-37. Approximately two and one-half hours later, at 9:30 or 9:45 p.m., Ms. Ocansey notified Mr. Mercado that Ms. Rodriguez was injured.  Tr. at 536-37.  It was not until 10:29 p.m. that staff called 911.  Tr. at 490, Def.'s Ex. H.   When Ms.Ocansey finally advised Mr. Mercado of the burns, she claimed falsely that she did not shower Ms. Rodriguez.  Tr. at 562.  Still later, she acknowledged that she showered Ms. Rodriguez, but claimed falsely that the water was cold.  Tr. at 562.  Ms. Ocansey also stated that she showered Ms. Rodriguez with warm water, but only for a short time. Tr. at 562.  While it is somewhat understandable, albeit not excusable, that Ms. Ocansey would attempt to distance herself from this tragic accident, her changing version of events seriously undermines her credibility.

Further, the Court found Plaintiff's expert forensic pathologist, Sridhar Natarajan, to be generally credible in his opinions that Ms. Rodriguez was scalded by an intermittent rise in water temperature during the showering process.  He testified that the total period of high water temperature lasted approximately two to five minutes and that the temperature likely reached from 125° to 130°F.  Tr. at 480-81.  His conclusions are based on his analysis of Ms. Rodriguez's burn patterns, as reflected in color photographs taken in the hospital.  Tr. at 472-80, 507; Ex. 77.  He also

United States District Court
For the Northern District of California

1  reviewed Ms. Rodriguez's medical records and other documentation pertaining to her injuries as

2  well as evidence reflecting the range of water temperatures at the home during that period.  Tr. at

3  480-82.  Mr. Natarajan has extensive experience in assessing injury causation with respect to burns.

4  Tr. at 479.  His testimony regarding Ms. Rodriguez's burns was based on a thorough examination of

5  the evidence and sound medical analysis.

6          Mr. Natarajan offered credible opinions that Roto-Rooter's theories of the manner in which

7  Ms. Rodriguez was burned, that is, that she was subjected to twenty or more minutes of exposure to

8  water below 120°F or to exposure to water at 130°F for approximately two to five minutes, are not

9  consistent with her injuries.  Tr. at 476, 482-85.  Mr. Natarajan testified credibly that Ms.

10  Rodriguez's injuries are inconsistent with a bucket of hot water being poured on her, and are more

11  consistent with water being moved around as with a shower wand of the kind in use at the

12  McGarvey Home.  Tr. at 475-76, 480-81. Similarly, Mr. Natarajan testified credibly that Ms.

13  Rodriguez's burns were inconsistent with the shower wand being left in her lap because there is no

14  single localized area of injury with lesser degree burns emanating from that site.  Tr. at 477.  He also

15  testified that the burns are inconsistent with an immersion scenario.  Tr. at 477.

16          By contrast, the Court did not find Roto-Rooter's burn expert, Dr. Michel Brones, to be

17  persuasive or his opinion credible.  His opinion regarding the cause of Ms. Rodriguez's injuries was

18  not based on the color photos of the injuries themselves or on an analysis of the burn patterns.  Tr. at

19  598, 611.  He did not refer to any treatises or scholarly articles in assessing the injuries.  Tr. at 610.

20  He speculated that there were errors in the medical records, but no evidence was presented to

21  support that speculation.

22  **4.        Failure to provide immediate treatment**

23          While the Court concludes that Roto-Rooter did not meet the standard of care for installation

24  of the water heater, the Court also concludes that Plaintiff failed to provide timely treatment to Ms.

25  Rodriguez, thereby exacerbating her injuries.  At the very least, the failure to obtain immediate

26  treatment had some effect on increasing the severity of the burns and increased Ms. Rodriguez's

27  pain and suffering.  However, the Court is not persuaded by many of Roto-Rooter's arguments

28  regarding a more severe impact from the delay in treatment.

10

United States District Court
For the Northern District of California

First, the Court finds that the delay in treatment did not *solely or primarily* cause third-degree burns, although the delay in treatment may well have contributed a modest amount to a progression from second to third degree burns. Ms. Rodriguez's burns were extensive and complicated, and Plaintiff's expert, Dr. Natarajan, noted some inconsistency in the documentation regarding the extent of her injuries during the initial medical evaluations. Tr. at 439. The paramedics who responded first described the burns as both second-degree and third-degree, and emergency room personnel described them as second-degree burns. Tr. at 441-45. Dr. Natarajan testified that color diagrams prepared early in Ms. Rodriguez's admission to the hospital reflect third-degree burns as well. Tr. at 447-49. He also testified that the medical records from the emergency responders noted that the burns were "scaly." Tr. at 500-01. The burn attending physician who first examined Ms. Rodriguez described her burns as "30% body surface area mostly second degree," and Natarajan testified that when discussing total body surface area burns, only second and third-degree burns are discussed. Tr. at 446-47. When a burn specialist examined Ms. Rodriguez on May 9, 2004, he described her burns as being both full thickness (third degree) and deep partial thickness (second degree). Tr. at 449-50; Ex. 86-62.

Second, there is no documentation from the date of hospital admission through the evaluation on May 9, 2004 to indicate that Ms. Rodriguez's burns became infected and thereby converted to third-degree burns as a result of the infection. Roto-Rooter's expert, Dr. Brones, testified that when a burn starts to look yellow or white, physicians can conclude that there is an infection. Tr. at 592. As stated above, however, the Court did not find Dr. Brones's opinion persuasive. Further, Roto-Rooter points to no evidence where Ms. Rodriguez's burns were described as yellow or white, and there is evidence that the medical reports, including various cultures and biopsies of the skin, did not show any infection. Tr. at 453, 463; Ex. 86-55, 86-65, 86-67, 86-76. Roto-Rooter's theory that Ms. Rodriguez's burns progressed from second to third degree because of infection is not supported by the record.

Third, the Court does not credit Roto-Rooter's theory that Ms. Rodriguez developed sepsis as a result of the delay in medical treatment. There is no evidence that Ms. Rodriguez became septic. Tr. at 453-56, 459; Ex. 86-55, 86-60, 86-65, 86-76. Dr. Brones testified that he believed that Ms.

United States District Court
For the Northern District of California

1    Rodriguez was septic, but he failed to support that belief with medical records.  Tr. at 605-08.

2          Finally, the Court concludes that the delay did not cause Ms. Rodriguez's pneumonia or her

3    need for  long-term subacute care.  Ms. Rodriguez developed aspiration pneumonia and later Adult

4    Respiratory Distress Syndrome while hospitalized.  The aspiration pneumonia developed after she

5    vomited and breathed in some vomitus, which was unrelated to the three-hour delay in obtaining

6    medical attention.  Tr. at 465-66.  The Court does not credit Roto-Rooter's theory that it has no

7    responsibility for Ms. Rodriguez's aspiration pneumonia and need for long-term subacute care

8    because these conditions were caused by the delay in treatment.  Roto-Rooter argues that Ms.

9    Rodriguez aspirated because of her need for skin graft surgery, and the need for surgery was

10   necessitated by the three-hour delay in treatment after the accident.  However, the evidence shows

11   that the aspiration did not occur during the skin graft surgery, but before Ms. Rodriguez was

12   intubated, and that the general anesthesia was performed without any difficulty.  Ex. 86-76, 86-180,

13   86-181.  Also, Ms. Rodriguez had vomited on at least two occasions prior to the skin graft surgery.

14   Ex. 86-58, 86-67.

15         The Court concludes that the delay in treatment somewhat exacerbated the degree of Ms.

16   Rodriguez's injuries and did exacerbate her pain.  Specifically, direct staff at the McGarvey Home

17   failed to take even the most basic treatment measures such as immediately calling 911.  Ms.

18   Rodriguez was not treated for pain, which both parties' experts agree was a 10 on a scale of 1 to 10

19   (Tr. at 513, 593-94), until the paramedics arrived more than three hours after the scalding incident.

20   **5.       The settlement**

21         Res-Care, RCCA, Kelli Stanton Clarke, Alfredo Mercado, Frederick Porche and Oretha

22   Ocansey were sued in a separate state court action (Conservatorship of the Person and Estate of

23   Theresa Rodriguez v. Res-Care, Inc., et al., San Mateo Superior Court Case No. 114740) for

24   damages sustained by Theresa Rodriguez as a result of the injuries she sustained from the scalding

25   incident on May 5, 2004.  See Joint Undisputed Fact # 19.  That case settled.  See id.  Pursuant to a

26   settlement agreement negotiated among Res-Care and Ms. Rodriguez, Res-Care agreed to pay the

27   settlement amount of $8.5 million to Theresa Rodriguez as set forth in the Settlement Agreement &

28   Mutual Release executed on or about July 24, 2008.  See Joint Undisputed Fact #20.  Payment

1    specified by the Rodriguez Settlement has been made pursuant to paragraph 2(a) of the Rodriguez

2    Settlement.  See Joint Undisputed Fact #21.

3    **Conclusions of Law**

4    **1.     Plaintiff has established that Roto-Rooter was negligent in the installation of the water heater at McGarvey Home**

5

6          In order to obtain indemnity recovery in this case, Plaintiff has the burden of proving that

     Roto-Rooter was negligent and that the negligence caused or contributed to Plaintiff's injuries.  See

7    Mullin Lumber Co v. Chandler, 185 Cal.App.3d 1127, 1134 (1986).  A party is liable for negligence

8    when there is: (1) a legal duty to use reasonable care; (2) breach of that duty; and (3) proximate

9    cause between  the breach and the injury.  Phillips v. TLC Plumbing,Inc., 172 Cal.App.4th 1133,

10   1139 (2009).  A party's negligent conduct is the proximate or legal cause of harm when it is a

11   substantial factor in bringing about the harm.  Restatement (2d) of Torts § 431.

12        **A.     Roto-Rooter owed a duty of care to Ms. Rodriguez**

13         Roto-Rooter argues that it did not owe a duty to Ms. Rodriguez because Roto-Rooter was

14   hired to replace a water heater, not to inspect the plumbing system or the fixtures, or to evaluate the

15   water temperatures at McGarvey Home.  See Williams v. Southern California Gas Co., 176

16   Cal.App.4th 591 (2009).  In Williams, the plaintiffs alleged that when an employee of the gas

17   company was in their home to inspect a gas water heater, the employee should have observed that a

18   wall furnace located in a living room on the way to the closet in which the gas water heater was

19   installed exhibited signs that noxious fumes were being vented into the home.  The court held that

20   the gas company had no duty to the plaintiffs because "the circumstance that respondent should have

21   realized that there was a defect in the wall furnace did not impose a duty on respondent to take

22   action or to warn appellants. Standing alone, knowledge of a dangerous condition does not impose a

23   duty on respondent."  Williams, 176 Cal.App.4th at 602.  Further:

24         "As a rule, one has no duty to come to the aid of another. A person who has not
           created a peril is not liable in tort merely for failure to take affirmative action to assist
25         or protect another unless there is some relationship between them which gives rise to
           a duty to act."  This principle is generally recognized and accepted. This rule applies
26         "no matter how great the danger in which the other is placed, or how easily he or she
           could be rescued" and even if the actor realizes or should realize that action on his
27         part is necessary for another's aid or protection.

28   Williams, 176 Cal.App.4th at 601 (internal citations omitted); see also Ambriz v. Petrolane Ltd, 49

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Cal.2d 470, 478-79 (1949) (holding that a butane supplier owed a duty of care to the plaintiffs when an explosion occurred in the cabin where the butane tank was being used that was caused by a leaky valve of which the butane supplier was aware).  Roto-Rooter argues that Mr. Campbell had no duty to inspect the mixing valve, which is more fairly considered to be part of the plumbing lines to the home rather than part of the water heater system.  Moreover, Roto-Rooter argues that neither Mr. Campbell nor Roto-Rooter was aware of any issues relating to the water heater other than it was leaking.  Accordingly, Roto-Rooter concludes that it owed no duty to the McGarvey Home residents other than to replace the leaking water heater.

Williams, however, is inapposite.  In that case, the wall furnace was not being inspected and was not connected to or in close proximity to the water heater that the gas company employee was in the home to inspect.  Under those facts, even if the gas company employee had knowledge that the wall furnace was a dangerous condition, he had no duty to warn.  Here, however, Roto-Rooter had more than a passing knowledge of a potential scald risk.  Although Mr. Campbell was dispatched to McGarvey Home to replace a leaking water heater, the evidence shows that the mixing valve was attached to the water heater and that Mr. Campbell had to touch the mixing valve to take out the old water heater.  The mixing valve had its own warning tag, and the water heater itself, and its instruction manual, had warnings about scald risks, particularly to children and the elderly.  Further, there is credible expert testimony that the standard of care for a plumber required more than simply reconnecting the water heater, firing it up and leaving.  For example, Mr. Campbell should have tested the water temperature and inspected the mixing valve that was in plain sight and connected to the water heater by a short branch line.  Tr. at 88-89; 140-143.

The general rule that there is no duty to come to the aid of another does not apply when the actor creates the peril or contributes to, increases or changes the risk which would have otherwise existed.  See Williams v. California, 34 Cal.3d 18, 23, 27 (1983).  Here, Roto-Rooter increased or changed the risk that existed before the water heater replacement because before the replacement, McGarvey Home did not have any problems with fluctuating water temperatures.  Moreover, it was obvious that disabled individuals lived at McGarvey Home, particularly because the home had a wheelchair ramp in the front, and because of the client name on the corporate account.  By installing

**United States District Court**
For the Northern District of California

the new water heater without setting and testing the temperature properly and without making sure there was a functioning mixing valve attached to the water heater even though the mixing valve was obviously corroded, and failing to recognize that McGarvey Home was a care facility, Roto-Rooter increased the risk of scalding to disabled residents of the care home.

> **B.      Roto-Rooter breached its duty of care**

As detailed above, Roto-Rooter did not provide training regarding mixing valves and did not provide training regarding Bradford White water heaters.  Roto-Rooter did not require its plumbers to be factory trained, and did not require them to read the Bradford White instruction manual.  Roto-Rooter did not provide training to its plumbers regarding plumbing work at care facilities, nor did it provide training regarding working on commercial accounts.  More specifically, Mr. Campbell testified that he was not trained in working with mixing valves, he did not receive factory training from Bradford White, he did not read the Bradford White instruction manual, he did not know what the mixing valve was on the old water heater at the McGarvey Home, and he did not look at the mixing valve.  He also testified that he was not trained in replacing a water heater at a care home and he did not inquire as to who would be using the water in the house.  He left McGarvey Home without checking the water temperature in the home after installing the new water heater.  Mr. Campbell was not an appropriately qualified plumber for replacement of the water heater at McGarvey Home.  He had never replaced a water heater at a care facility, and he did not recognize that McGarvey Home was a care facility when he arrived at the location despite the highly visible wheelchair ramp to the front of the home and the corporate name on the invoice.

Further, Mr. Campbell had received no training about the risks of scalding children and disabled and elderly individuals.  Mr. Campbell failed to see the prominent warning in the Bradford White manual and on the water heater itself regarding the scald risk particularly to children and the elderly.  He failed to notice and abide by the recommended setting for the temperature dial and he failed to note that Bradford White recommended use of a mixing valve with the water heater.  In fact, Mr. Campbell was never trained with respect to mixing valves.  When Mr. Campbell installed the new water heater, he failed to take note of the temperature setting of the old water heater and then proceeded to set the new water heater in excess of the recommended temperature.  Finally, he

United States District Court
For the Northern District of California

1    did not enter the McGarvey Home during the installation, not even to test the water coming out of

2    the faucets.[2]

3            Plaintiff's experts, Adolf Wolf and John Giacoma, testified that Mr. Campbell breached the

4    standard of care with respect to the installation of the water heater.  The Court finds that both Mr.

5    Wolf and Mr. Giacoma were credible experts. In particular, Mr. Wolf opined that the water

6    temperature fluctuated following installation of the water heater because, among other things, the

7    mixing valve had been "jarred around and banged on" during the installation of the water heater. Tr.

8    at 88.  Further, Roto-Rooter's own employee, Rich Wieder, testified that his own practice differed

9    from Mr. Campbell's, particularly in that Mr. Weider had a practice of setting a water heater

10   temperature knob to the red mark (the recommended setting), a practice of visually inspecting

11   mixing valves and a practice of going into the home where he was working to find out as much

12   about the living situation there as he could.  He would also discuss the water heater temperature

13   setting with the customer and would advise the customer to keep the temperature low if children or

14   elderly persons were present.  Roto-Rooter failed to meet the standard of care.

15       **C.    Roto-Rooter's negligence was a proximate cause of Ms. Rodriguez's injuries**

16           As described in detail above, but for Mr. Campbell's negligent water heater installation, Ms.

17   Rodriguez would not have been scalded.  Before the new water heater was installed, the water

18   temperature was consistently at safe levels.  When the water heater was replaced, it was set at a

19   temperature above the manufacturer's recommended setting.  Mr. Campbell failed to pay any

20   attention to the mixing valve that was attached to the water heater, nor did he even know what a

21

22       [2]        In addition, on the day after the scalding incident, Mr. Campbell conducted a follow up
23   visit to McGarvey Home.  Tr. at 20-21.  He testified at trial that he checked the water coming from the
     showerhead by putting his hand under the stream of water to determine if the water was too hot.  Tr. at
24   23.  He also testified that he checked the water temperature in the kitchen sink and bathroom shower
     with a thermometer, and that the temperature reading at the time of his inspection was 110°F.  Tr. at 25,
25   28. From this one thermometer reading and feeling the water with his hand, Mr. Campbell concluded
     that the water heater "tested fine." Tr. at 26.  Mr. Campbell did not make any adjustments to the water
26   heater to account for the fluctuating temperatures of the previous days, despite the fact that he was told
     that someone had been burned (although he did not inquire further about the nature and extent of the
27   burn and thought it might be a burned hand).  Tr. at 21-22.  His inspection of the water temperature on
     the day after the scalding incident, which consisted of one temperature reading, was plainly inadequate.
28   Although this inadequate inspection did not cause the injury to Ms. Rodriguez, it shows Mr. Campbell's
     lack of suitable training and qualifications for the job Roto-Rooter originally sent him to do before the
     accident.

United States District Court
For the Northern District of California

1  mixing valve was.  He did not wait for the water to heat up so that he could test the temperature of

2  the water coming out of the faucets in the house.  Although there is evidence that Mr. Porche

3  adjusted the temperature on the water heater after the installation but before the accident, there is no

4  evidence that he adjusted it upward; to the contrary, he adjusted it to be cooler.  Further, when Mr.

5  Weider arrived at McGarvey Home to inspect the water heater after the accident, the temperature

6  setting was below the normal setting.  After Mr. Weider replaced the mixing valve, the water

7  temperature in the home stabilized.  As stated above, the Court concludes that the water temperature

8  was fluctuating after the water heater installation and before the scalding accident.

9      The Court does not credit Ms. Ocansey's testimony regarding how the scalding accident

10  occurred, although it does not conclude that Ms. Ocansey intended to injure Ms. Rodriguez.  The

11  Court credits Dr. Natarajan's testimony, which was well-supported by his prior experience and Ms.

12  Rodriguez's medical records, that Ms. Rodriguez was scalded by a short two to five minute spike in

13  water temperature during the showering process and that the water temperature likely reached from

14  125°F to 130°F.  In contrast, Dr. Brones' opinion regarding the cause of the injury was not

15  persuasive, among other reasons, because he relied on supposed errors in the medical records, yet no

16  errors were shown by Roto-Rooter.

17      **D.      Plaintiff's conduct was not a superceding cause of Ms. Rodriguez's injuries**

18      Even assuming that Mr. Campbell fell below the standard of care in not inspecting the

19  mixing valve, Roto-Rooter argues that it was not reasonably foreseeable that Ms. Ocansey would

20  commit dependent adult abuse or that direct care staff at the McGarvey Home would delay in

21  seeking treatment for Ms. Rodriguez's injuries for over three hours.  Thus, Roto-Rooter argues that

22  Plaintiff's conduct was a superceding cause of Ms. Rodriguez's injuries and so Roto-Rooter is not

23  liable for those injuries.  "A superseding cause is an act of a third person or other force which by its

24  intervention prevents the actor from being liable for harm to another which his antecedent

25  negligence is a substantial factor in bringing about."  Restatement of Torts, § 440.  "Where,

26  subsequent to the defendant's negligent act, an independent intervening force actively operates to

27  produce the injury, the chain of causation may be broken. It is usually said that if the risk of injury

28  might have been reasonably foreseen, the defendant is liable, but that if the independent intervening

17

**United States District Court**
For the Northern District of California

1    act is highly unusual or extraordinary, not reasonably likely to happen and hence not foreseeable, it

2    is a superseding cause, and the defendant is not liable."  6 Wiktin, <u>Summary of California Law</u>, §

3    1197 (10th ed. 2005).

4           "Whether the act of the third person is a superseding cause depends in part on whether it (and

5    plaintiff's injury) was reasonably foreseeable."  <u>Powell v. Standard Brands Paint Co.</u>, 166

6    Cal.App.3d 357, 364 (1985); <u>see also</u> <u>Torres v. Xomox Corp.</u>, 49 Cal.App.4th 1, 19 (1996) ("It must

7    appear that the intervening act has produced 'harm of a kind and degree so far beyond the risk the

8    original tortfeasor should have foreseen that the law deems it unfair to hold him responsible.' . . . As

9    Xomox notes, there are cases in which the modification of a product has been determined to be so

10   substantial and unforeseeable as to constitute a superseding cause of an injury as a matter of law. . .

11   However, foreseeability is a question for the jury unless undisputed facts leave no room for a

12   reasonable difference of opinion.  . . . Thus, the issue of superseding cause is generally one of fact.")

13   (internal citations omitted); <u>Pappert v. San Diego Gas & Electric Co.</u>, 137 Cal.App.3d 205, 210

14   (1982) ("Several cases express this proposition in the strict affirmative, stating '[t]he general test of

15   whether an independent intervening act, which operates to produce an injury, breaks the chain of

16   causation is the foreseeability of that act.' . . . However, as explained by our Supreme Court . . . the

17   foreseeability test is twofold relating both to the act and the nature of harm suffered . . . ") (internal

18   citations omitted); <u>Bigbee v. Pacific Tel. & Tel. Co.</u>, 34 Cal.3d 49, 55-56 (1983) ("Ordinarily,

19   foreseeability is a question of fact for the jury. It may be decided as a question of law only if, "under

20   the undisputed facts there is no room for a reasonable difference of opinion."") (internal citation

21   omitted).  In <u>Bigbee</u>, the court stated that:

22           In pursuing this inquiry, it is well to remember that "foreseeability is not to be
             measured by what is more probable than not, but includes whatever is likely enough
23           in the setting of modern life that a reasonably thoughtful [person] would take account
             of it in guiding practical conduct." (2 Harper & James, <u>Law of Torts</u>, supra, § 18.2, at
24           p. 1020.) One may be held accountable for creating even "'the risk of a slight
             possibility of injury if a reasonably prudent [person] would not do so.'" ( <u>Ewart v.</u>
25           <u>Southern Cal. Gas Co.</u> (1965) 237 Cal.App.2d 163, 172 [46 Cal.Rptr. 631], quoting
             from Vasquez v. Alameda (1958) 49 Cal.2d 674, 684 [321 P.2d 1] (dis. opn. of
26           Traynor, J.); <u>see also</u> <u>Crane v. Smith</u> (1943) 23 Cal.2d 288, 299 [144 P.2d 356]; see
             generally, Rest.2d Torts, § 291.) Moreover, it is settled that what is required to be
27           foreseeable is the general character of the event or harm - e.g., being struck by a car
             while standing in a phone booth - not its precise nature or manner of occurrence. (
28           <u>Taylor v. Oakland Scavenger Co.</u> (1941) 17 Cal.2d 594, 600 [110 P.2d 1044]; <u>Gibson</u>
             <u>v. Garcia</u> (1950) 96 Cal.App.2d 681, 684 [216 P.2d 119]; <u>see generally</u>, Rest.2d

Torts, § 435, subd. 1, com. a.)

Bigbee, 34 Cal.3d at 57-58 ("Here, defendants placed a telephone booth, which was difficult to exit, in a parking lot 15 feet from the side of a major thoroughfare and near a driveway. Under these circumstances, this court cannot conclude as a matter of law that it was unforeseeable that the booth might be struck by a car and cause serious injury to a person trapped within.").

It is undisputed that a water heater that is not properly installed in a home creates a risk of scald injuries, especially to children and the elderly. That risk is entirely foreseeable, particularly to plumbing professionals. Tr. at 72-73, 154-55, 383. That a resident of the home would be scalded while showering was not an unforeseeable consequence of Roto-Rooter's negligence, even assuming that Ms. Ocansey was negligent in the way she showered Ms. Rodriguez or her conduct after the shower. The Court has already found that there is no evidence that Ms. Ocansey intentionally injured Ms. Rodriguez or knew that the fluctuating water temperatures would scald her. Cf., e.g., Premo v. Grigg, 237 Cal.App.2d 192 (1965) (finding no liability on the part of a restaurant for the death of a child who fell into a bucket of extremely hot water where the restaurant was not aware that a janitor was using hot water at full heat for cleaning rather than diluting it with cold water).

Moreover, the delay in seeking medical treatment was not a superceding cause. As described above, Ms. Rodriguez's physical injuries were somewhat exacerbated by the delay in medical treatment, but that the delay did not cause any serious medical complications nor significantly increase Ms. Rodriguez's injuries such that Roto-Rooter can escape all liability for her injuries.

Accordingly, the Court concludes that Roto-Rooter was negligent in the installation of the water heater. Even though some of Plaintiff's conduct in delaying treatment may have been unforeseeable, Roto-Rooter remains liable in indemnity for a portion of the settlement amount.

**2.      The settlement in this case was reasonable and Plaintiff is entitled to indemnity from Roto-Rooter**

   **A.      The settlement amount was reasonable**

Analyzing the reasonableness of the settlement amount from an objective viewpoint, the Court concludes that the $8.5 million settlement was reasonable. Ms. Rodriguez suffered severe injuries as a result of the scalding accident. She had a long hospitalization at Santa Clara Valley

19

United States District Court
For the Northern District of California

1   Medical Center, during which she underwent treatment for her burns, including skin grafts.  During

2   her hospitalization, she contracted aspiration pneumonia, which progressed to Adult Respiratory

3   Distress Syndrome.  As a result, Ms. Rodriguez required long-term use of a tracheotomy tube and a

4   gastrostomy tube.

5        Ms. Rodriguez was discharged from Santa Clara Valley Medical Center on August 11, 2004,

6   to the subacute unit at Seton Hospital.  Ex. 90-002.  She continued to breathe through her

7   tracheotomy tube and to be fed through the gastrostomy tube.  Id.  Her physician at Seton, Dr.

8   Hazelhurst, testified in the underlying case that it was unlikely that Ms. Rodriguez would ever be

9   weaned from the tubes and that she would require subacute care for the remainder of her life.

10  Hazelhurst Depo. at 49.  Ms. Rodriguez's experts opined that her life expectancy was fifteen years,

11  and that her care cost $1,750,408.60 per year.  Ex. 1 at 9; 83 at 2-3; Hazelhurst Depo. at 49.  In the

12  underlying case, Res-Care's expert opined that Ms. Rodriguez's life expectancy was seven years and

13  that she could live in a less acute, less expensive care facility.  At the time that settlement

14  negotiations began, Ms. Rodriguez estimated her future medical damages alone to be over $25

15  million.  Ex. 2 at 10 (care cost $4,759.64 per day).

16       The Court credits the testimony of Plaintiff's expert, Guy Kornblum, who opined in this case

17  that the settlement in this case was reasonable in light of Ms. Rodriguez's serious injuries and the

18  cost of future care because of those injuries.  Tr. at 187, 192.  He testified that $8.5 million "was a

19  very good number for the defense without any question."  Tr. at 202.  Roto-Rooter presented no

20  evidence to contradict Mr. Kornblum's testimony.  Thus, the Court concludes that the settlement

21  amount was reasonable.

22       **B.      The entire settlement is subject to indemnity and contribution**

23       Where the "settling parties have failed to allocate, the trial court must allocate in the manner

24  which is most advantageous to the nonsettling party."  Dillingham Construction v. Nadel

25  Partnership, 64 Cal.App.4th 264, 287 (1998); see also Knox v. County of Los Angeles, 109

26  Cal.App.3d 825, 835 (1980) (holding that the plaintiff has the burden of proving an agreed

27  allocation in a settlement as between the claims in which joint tortfeasor status was alleged, so the

28  court could determine the appropriate setoff amount to be applied against a money judgment entered

United States District Court
For the Northern District of California

in the plaintiff's favor after trial against a non-settling defendant, and remanding for further

proceedings to determine the setoff amount). The testimony of an attorney for the party seeking

indemnification is not reliable evidence of the allocation. See id. at 285; id. at 277 (testimony from

attorney and expert not sufficient to show allocation because the numbers "sprang from the head of

counsel for Dillingham and were not the subject of negotiation or allocation by the settling parties.

Nor were the allocations the subject of the hearing undertaken to determine the good faith of the

settlement, which resolved the issue of only whether the settlement as a whole was adequate."). The

Dillingham court also stated:

> However, since no allocation was contained in the settlement agreement or presented
> to the trial court at the time of the good faith hearing, Dillingham was foreclosed
> from basing its indemnification claim against Nadel on the terms of the settlement.
> Where a settling defendant is entitled to only partial indemnity, failure to allocate
> between claims in the settlement agreement means that damages must be proven
> without the presumptive evidence of the nonsettling defendant's liability afforded by
> a settlement agreement in which proceeds have been allocated. In that situation, the
> settlement amount works only to place an upper limit on the indemnity claim, and an
> undisclosed and possibly nonexistent allocation cannot be used to establish actual
> damages.

Dillingham, 64 Cal.App.4th at 284; id. at 285 ("As we see it, a reasonable settlement amount can be

used to establish damages in equitable indemnity actions, where (1) the parties to the settlement

agreement have entered into a negotiated agreement specifically allocating settlement proceeds

between claims; and (2) in a proceeding in which the nonsettling parties are allowed to be heard, the

trial court finds that the allocation was made in good faith. If no such pretrial allocation and

determination has been made, there may be other methods to establish damages. However, an

attorney for the party seeking indemnification cannot be permitted to testify, after the fact, as to how

he believes settlement proceeds would have been allocated had the parties negotiated and resolved

the issue.").

　　　"Where multiple tortfeasors are responsible for an indivisible injury suffered by the plaintiff,

each tortfeasor is jointly and severally liable to the plaintiff for those damages and thus may be held

individually liable to the injured plaintiff for the entirety of such damages." Expressions at Rancho

Niguel v. Ahmanson Development Inc., 86 Cal.App.4th 1135, 1139 (2001). An individual

tortfeasor's joint and several liability for noneconomic damages is limited to its proportion of fault.

21

Marina Emergency Medical v. Superior Court, 84 Cal.App.4th 435, 439 (2000); Cal. Civil Code § 1431.2 (requiring that liability for noneconomic damages must be several, not joint).

The failure to allocate is not fatal to a determination of indemnity, but instead when there is no allocation, the trier of fact must determine the allocation before determining indemnity. See Dillingham, 64 Cal.App.4th at 276; Union Pacific Corp. v. Wengart, 79 Cal.App.4th 1444, 1448 (2000) (stating that the jury in that case should have been instructed to determine the amount of settlement attributable to economic losses and the defendant should have only been charged with his proportionate share of that amount). In Union Pacific, the court stated that:

> When liability is "several only and ... not joint," we see no justification for permitting one defendant to satisfy the liability of another and then seek to recover for a payment it was never obliged to make.

Union Pacific, 79 Cal.App.4th at 1449.

Roto-Rooter argues that Plaintiff is not entitled to indemnification because it failed to allocate the settlement not only as to the claims, but also as to economic and noneconomic damages. Roto-Rooter relies on Essex v. Heck, 186 Cal.App.4th 1513 (2010) to argue that Plaintiff has impliedly waived its right to seek indemnity because there was no allocation in the settlement. In Essex, after a worker was seriously injured on the job, the liability insurer filed a cross-complaint against the physician who treated the worker, seeking to recover amounts that the insurer had paid to settle the worker's personal injury claim and two related actions involving the worker's original personal injury claim and the worker's bad faith claim against the insurer. The appellate court affirmed the trial court's grant of summary judgment in favor of a physician, finding that the insurer had waived any claim for equitable subrogation when it entered into one settlement agreement and release involving three separate lawsuits that did not allocate the settlement among each of the cases.

Essex is inapposite. First, Essex was not an equitable indemnity and contribution case like this one. Instead, the plaintiff in Essex brought a complicated equitable subrogation case. Plaintiff is not making an equitable subrogation claim in this case. Second, even if the type of claim in this case were not different, Essex is also factually distinguishable. The unallocated settlement agreement in Essex resolved three separate cases and released multiple parties. Because of this complexity, it was impossible to determine to what extent the insurer was stepping into the shoes of

22

United States District Court
For the Northern District of California

the insured in paying the settlement for purposes of equitable subrogration, which "permits a party who has been required to satisfy a loss created by a third party's wrongful act to 'step into the shoes' of the loser and pursue recovery from the responsible wrongdoer." Essex, 186 Cal.App.4th at 1523 (internal citation omitted).  "In the insurance context, the doctrine permits the paying insurer to be placed in the shoes of the insured and to pursue recovery from third parties responsible to the insured for the loss for which the insurer was liable and paid." Id. (internal citation omitted). Complicating matters even further, in Essex, the insurer had taken the position in one of the three lawsuits that the named defendant in the personal injury lawsuit was not its named insured.  Here, by contrast, the settlement at issue resolved one lawsuit.

Further, unlike in Essex, Plaintiff in this case did not thwart efforts to obtain evidence as to the allocation issue.  Roto-Rooter attended Mr. Waskey's deposition during which he testified regarding the allocation of the settlement.  Plaintiff disclosed its expert Kornblum on the issue of the factors driving the settlement.  Moreover, Roto-Rooter did not contact Plaintiff's counsel in the underlying case to discover information about settlement allocation.  At trial, Plaintiff presented credible testimony from Mr. Kornblum that the focus of the settlement was on Ms. Rodriguez's medical expenses only, including the increased pain and suffering she sustained from the delay in treatment.

Nothing in Plaintiff's conduct would justify Roto-Rooter's belief that Plaintiff waived its right to seek indemnity or contribution.  Plaintiff initially sued Roto-Rooter as a cross-defendant in the underlying lawsuit, and dismissed it without prejudice prior to trial.  The settlement agreement itself only released claims between Plaintiff and Ms. Rodriguez, and expressly reserved claims against all parties not named in the agreement. Ex. 1 at 3 ("It is further understood and agreed that this release does not, and is not intended to, release and discharge any claim or potential claim against any other person or entity not identified herein.").  Mr. Waskey's testimony does not compel a different result.  Although he stated in his deposition that the settlement amount did not contain any funds that reflected conduct of parties other than Plaintiff, his explanation at trial was credible that he understood the question asked at the deposition to ask whether Plaintiff settled all of Ms. Rodriguez's claims and whether Plaintiff had no intention of releasing other parties.  Tr. at 313-14.

United States District Court
For the Northern District of California

It is undisputed that there was no formal allocation of the state court settlement in this case, and that the settlement was for a lump sum. The evidence at trial, however, demonstrated that the settlement was paid to compensate Ms. Rodriguez for economic damages. Plaintiff's Secretary, Chief Compliance Officer and General Counsel, David Waskey, was directly involved in negotiating the settlement. Tr. at 295. Although Mr. Waskey's testimony is somewhat self-serving, the Court credits his testimony that the focus of the negotiations was the cost of care for Ms. Rodriguez, taking into account her past and future medical expenses and her life expectancy. Tr. at 296, 299. He testified that no part of the $8.5 million settlement was for anything other than medical expenses. Tr. at 299, 301. Further, in a July 13, 2007 demand letter from Ms. Rodriguez's attorney, Niall McCarthy, to Plaintiff in the underlying state court case, her counsel opined that a jury would award Ms. Rodriguez substantial pain and suffering damages, but those damages were not included in the calculations supporting the settlement demand. Ex. 2. Notably, the letter was not written by Plaintiff, and even Roto-Rooter appears to concede that it is valid evidence to support an allocation of the settlement to the negligence claim. In the letter, counsel stated that Ms. Rodriguez was willing to settle for $22 million, "an amount millions of dollars less than the cost of Theresa's estimated lifetime cost of care since her injury." Ex. 2 at 12. The letter also states that: "*If* this case does not resolve informally, the County will demand the entire cost of care, pain and suffering, attorney's fees and punitive damages." Id. (emphasis added). Roto-Rooter provided no credible evidence at trial that any of the settlement amount was allocated to pain and suffering.

Roto-Rooter argues that the Court must disregard Mr. Waskey's after-the-fact testimony regarding the allocation of the settlement amount. See Dillingham, 64 Cal.App.4th at 285 (stating that the court should disregard the testimony of a party or its counsel "after the fact . . . as to how he believes the settlement proceeds would have been allocated had the parties negotiated and resolved the issue."). However, as Plaintiff points out, Mr. Waskey testified in his capacity as a corporate officer, not as litigation counsel, who was directly involved in settling the Rodriguez case. Further, Dillingham did not require that the testimony of counsel be disregarded.

Roto-Rooter also argues that reliance on Mr. Kornblum's testimony was improper. However, Roto-Rooter did not object to Mr. Kornblum as an expert witness before or during trial,

1  and the Court found him to be qualified as an expert on the reasonableness of the settlement.  Tr. at

2  186.  Roto-Rooter did not provide any testimony to contradict Mr. Kornblum, who presented

3  credible evidence regarding the settlement.

4        There is no evidence that any portion of the settlement was paid for punitive damages.  Tr. at

5  197-99.  The July 13, 2007 letter from Ms. Rodriguez's counsel made clear that the settlement

6  demand did not include an amount for punitive damages.  Tr. at 198; Ex. 2 ("While Plaintiff is not

7  including a punitive damages figure in this demand, punitive damages are a significant risk for

8  Defendants.").  As described above, the letter mentions attorney's fees, pain and suffering, and

9  punitive damages, but does not include those elements of damages in the settlement demand.  Roto-

10  Rooter has provided no credible evidence to the contrary that the settlement focused on anything

11  other than the cost of Ms. Rodriguez's care.

12        In addition, there is no credible evidence that the settlement was paid for claims other than

13  negligence.  Tr. at 220.  Ms. Rodriguez's state court case also included claims for violation of

14  Business and Professions Code section 17200, breach of fiduciary duty, and violation of Welfare and

15  Institutions Act section 15657(a) for dependant adult abuse.  However, Plaintiff's only exposure in

16  the face of a successful claim under section 17200 would be injunctive relief, not monetary

17  damages.  See Cal. B&P Code § 17203; Tr. at 220.  Roto-Rooter argues that Plaintiff's liability to

18  Ms. Rodriguez on this claim would have been several and Plaintiff still would have been required to

19  defend against this claim at the time of the settlement.  HoweveRoto-Rooter, this does not change

20  the fact that Plaintiff's exposure would have been only for injunctive relief, and therefore, the Court

21  credits Mr. Waskey's testimony that none of the monetary relief in the settlement would have been

22  allocated to this claim.  Roto-Rooter presented no credible evidence to the contrary.

23        Further, the Court has previously held in a pretrial ruling that there was no basis under

24  California law for Ms. Rodriguez's breach of fiduciary duty claim.  Roto-Rooter acknowledged that

25  the Court ruled that breach of fiduciary duty claim would not be a basis for liability against Plaintiff

26  in the underlying action.  It only points to Mr. Cutchshaw's evidence at trial that Plaintiff managed

27  its clients' finances (Tr. at 277-279), which does not show any nexus with Ms. Rodriguez's burn

28  injuries.  Roto-Rooter has presented no credible, relevant evidence that would cause the Court to

United States District Court
For the Northern District of California

1  revisit its pretrial ruling even in light of Mr. Cutchshaw's testimony on this point.

2      Also, if successful, Ms. Rodriguez's claim for dependent adult abuse could only have

3  resulted in an enhanced damages award for attorney's fees, not for pre-death pain and suffering.  See

4  Cal. Welf. & Inst. Code § 15757(a).  However, the settlement agreement expressly excluded

5  attorney's fees.  Further, because Ms. Rodriguez was still alive at the time of the settlement,

6  additional damages allowed under the Welfare and Institutions Code for pain and suffering in a

7  survival action did not apply.  See Tr. at 199-200, 220.

8      Finally, there is no evidence that the settlement was paid for intentional wrongful conduct by

9  Ms. Ocansey.  Although her conduct was below the standard of care and contrary to her training, the

10  Court does not conclude that she intended to injure Ms. Rodriguez.  For example, no evidence was

11  introduced to show that she bore any malice toward Ms. Rodriguez or was inclined to treat residents

12  cruelly, although she apparently panicked after scalding Ms. Rodriguez and tried to avoid blame.

13  Roto-Rooter argues that any liability under this section would have been several and interpreting the

14  settlement agreement in the light most favorable to Roto-Rooter requires the Court to conclude that

15  the entire settlement was allocated to this claim rather than to the negligence claim.  However, Roto-

16  Rooter provided no credible evidence at trial to contradict the testimony of Mr. Waskey and Mr.

17  Kornblum, both of whom the Court finds credible, that the settlement was allocated only to the

18  negligence claim.

19      Thus, the Court concludes, based on the uncontroverted evidence, that the entire settlement is

20  allocated to Ms. Rodriguez's negligence claim, for which Plaintiff and Roto-Rooter are jointly and

21  severally liable.

22  **3.      Roto-Rooter is liable for fifteen percent of the settlement amount**

23      For the reasons stated above, the Court concludes that while Roto-Rooter's negligence

24  partially caused the scalding accident, Plaintiff was also negligent in failing to exercise sufficient

25  care in showering Ms. Rodriguez, after being aware of fluctuating temperatures and in failing to

26  seek prompt treatment for Ms. Rodriguez.  Plaintiff was on notice from the water temperature log

27  that the water temperature was fluctuating throughout the day shortly after installation of the new

28  water heater, yet Plaintiff failed to follow its own polices to discontinue showers under those

United States District Court
For the Northern District of California

1    conditions.  Plaintiff's staff also failed to follow Plaintiff's policy to obtain prompt medical

2    treatment for residents.  Given Plaintiff's failure to follow its own health and safety policies, the

3    Court does not find that the negligence of Roto-Rooter and Plaintiff contributed equally to Ms.

4    Rodriguez's injuries, but instead finds that Roto-Rooter's negligence contributed less significantly.

5    Thus, the Court concludes that Roto-Rooter is liable for fifteen percent of the settlement amount.

6         The Court invited post-trial briefing on the issue of the calculation of the impact of Plaintiff's

7    prior settlements with Defendants Leonard Valve and Bradford White on Roto-Rooter's share of

8    Plaintiff's damages.  Only Plaintiff provided briefing regarding the calculation.  Thus, Roto-Rooter

9    has waived any arguments as to the proper method of applying the offsets.

10        California law states:

11        Where a release, dismissal with or without prejudice, or a covenant not to sue or not
          to enforce judgment is given in good faith before verdict or judgment to one or more
12        of a number of tortfeasors claimed to be liable for the same tort, or to one or more
          other co-obligors mutually subject to contribution rights, it shall have the following
13        effect: (a) It shall not discharge any other such party from liability unless its terms so
          provide, but it shall reduce the claims against the others in the amount stipulated by
14        the release, the dismissal or the covenant, or in the amount of the consideration paid
          for it whichever is the greater.

15   Cal. Code Civ. P. 877(a).  Plaintiff argues that pursuant to section 877(a), the Leonard Valve and

16   Bradford White settlements are first offset against the total $8.5 million settlement, and Roto-

17   Rooter's percentage share of the settlement is then calculated from the revised total settlement

18   amount.  Roto-Rooter provided no authority to the contrary.  Further, Espinoza v. Machonga, 9

19   Cal.App.4th 268 (1992) does not compel a different result.  There, all of the defendants, including

20   the defendant that settled in advance of the arbitration, were before the arbitrator, who calculated the

21   amount of damages and the corresponding percentage of responsibility for each party.  Here, the

22   Court was not asked to nor was presented with sufficient evidence to calculate the percentage of

23   liability borne by Leonard Valve and Bradford White, respectively.

24        Bradford White settled with Plaintiff for $115,000, which has been paid.  Therefore, the

25   settlement amount is reduced by that amount to $8,385,000.  Leonard Valve has settled for

26   $125,000, although that amount has not yet been paid, so it will not be deducted from the settlement

27   amount at this time.  See Garcia v. Duro Dyne Corp., 156 Cal.App.4th 92, 100-01 (2007) (holding

28   that "a nonsettling defendant is not entitled to an offset for such a settlement until the settlement

**United States District Court**
For the Northern District of California

monies have been paid," and that a judgment can be amended to include a reservation of jurisdiction for the trial court to calculate and award offset credits to the nonsettling defendant for any future settlement payments that are made). Thus, Plaintiff is entitled to judgment for indemnity in the amount of fifteen percent of $8,385,000, or $1,257,750, which will be further reduced to $1,239.000 after Leonard Valve pays its full settlement amount to Plaintiff. Plaintiff shall provide proof of payment, along with a proposed amended judgment, to the Court no later than ten days after Leonard Valve submits its payment to Plaintiff.

**IT IS SO ORDERED.**

Dated: August 3, 2011

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge